1  Amy B. Vandeveld, SBN 137904
   LAW OFFICES OF AMY B. VANDEVELD
2  1850 Fifth Avenue, Suite 22
   San Diego, CA  92101
3  Telephone: (619) 231-8883
   Facsimile: (619) 231-8329
4
   Attorney for KAREL SPIKES
5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10 KAREL SPIKES,                          Case No.: 07 CV 2394 LAB
                                          (WMc)
11              Plaintiff,
                                          **MEMORANDUM OF POINTS**
12 vs.                                    **AND AUTHORITIES IN**
                                          **SUPPORT OF PLAINTIFF'S**
13 EUROPEAN CAR SERVICE; ANDREW           **OPPOSITION TO**
   MACIEJEWSKI; ZENNON SMOCYNSKI and      **DEFENDANTS' MOTION TO**
14 DOES 1 THROUGH 10, Inclusive,          **DISMISS AND REQUEST FOR**
                                          **ENTRY OF SUMMARY**
15              Defendants.               **JUDGMENT IN FAVOR OF**
                                          **PLAINTIFF**
16
                                          **[FRCP 12(B)(1)]**
17

18                                        Date:   April 14, 2008
                                          Time:   11:15 a.m.
19                                        Courtroom: 9
                                          Judge: The Honorable Larry A.
20                                            Burns

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.     DEFENDANTS' MOTION IS A FACTUAL
       ATTACK AND SHOULD BE TREATED AS
       A MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . 2

II.    STANDING IS TO BE LIBERALLY CONSTRUED
       IN CIVIL RIGHTS CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   TESTERS HAVE STANDING UNDER
       THE AMERICANS WITH DISABILITIES ACT

       A.    Standing Under Title II of the ADA . . . . . . . . . . . . . . . . . . . . . . . . .
                                                                                           6

       B.    Title III of the ADA Creates Legal Rights for "Any
             Person" With a Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       C.    Title III Standing Is Not Limited to "Customers" and "Clients" . . . . . 8

       D.    Tester Standing Furthers the Congressional
             Intent to Eradicate Discrimination . . . . . . . . . . . . . . . . . . . . . . . . 9

                                                     . . . . . . . . . . . . . . . . . . . . . . . . . . . .
IV.    PLAINTIFF'S CLAIM AGAINST
       DEFENDANTS IS MERITORIOUS

       A.    Plaintiff Is Disabled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       B.    Plaintiff Sought the Services of Defendants . . . . . . . . . . . . . . . . . . 13

       C.    Defendants' Public Accommodation Is Inaccessible . . . . . . . . . . . . . 14

V.     PLAINTIFF SUFFERED AN INJURY
       IN FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VI.    PLAINTIFF IS COMMITTED TO
       COMPELLING REMOVAL OF
       ARCHITECTURAL BARRIERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VII.   MR. MACIEJEWSKI SHOULD BE REQUIRED
       TO APPEAR BEFORE THIS COURT
       TO DISPUTE SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VIII.  CONCLUSION AND REQUEST FOR ENTRY OF
       SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR . . . . . . . . . . . . . . . 19

i

# TABLE OF AUTHORITIES

**Cases**

*Botosan v. McNally Realty,*
    216 F.3d 827, 835 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Doran v. 7-Eleven, Inc.,*
    506 F.3d 1191, 1198 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 9, 14

*Feezor v. Chico Lodging, LLC,*
    422 F. Supp. 2d 1179 (E.D. Cal. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,*
    (S. Ct. 2000) 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 . . . . . . . . . 4

*Gould Elecs., Inc. v. United States,*
    220 F.3d 169, 176 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Havens Realty Corp. v. Coleman,*
    (S. Ct. 1982) 455 U.S. 363, 102 S. Ct. 1114 . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 7

*Menkowitz v. Pottstown Mem'l Med. Ctr.,*
    154 F.3d 113, 122 (3d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Molski v. M.J. Cable, Inc.,*
    2007 U.S. App. Lexis 6794 (9th Cir., March 23, 2007) . . . . . . . . . . . . . . . . . . 8, 9

*PGA Tour, Inc. v. Martin,*
    532 U.S. 661, 676-677 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Pickern v. Holiday Quality Foods Inc.,*
    293 F.3d 1133, 1137-1138 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

*Roberts v. Corrothers,*
    812 F.2d 1173, 1177 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Tandy v. City of Wichita,*
    380 F.3d 1277 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.,*
    594 F.2d 730, 733 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Trafficante v. Metropolitan Life Insurance,*
    409 U.S. 205, 93 S. Ct. 364, 34 L. Ed. 2d 415 . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Warren v. Fox Family Worldwide, Inc.,*
    328 F.3d 1136, 1139 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Wilson v. Pier 1 Imports,*
    413 F.Supp.2d 1130 (E.C. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Practice Guides**
*Moore's Federal Practice* § 12.30 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Statutes- Federal**
F.R.Civ.P. Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
42 U.S.C. § 12132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. § 12181(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
42 U.S.C. § 12182 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8
42 U.S.C. § 12188 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Regulations**
28 C.F.R. § 36.104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
**House Conference Reports**
H.R. Rep. No. 101-485(II), at 22-23 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

iii

Amy B. Vandeveld, SBN 137904
LAW OFFICES OF AMY B. VANDEVELD
1850 Fifth Avenue, Suite 22
San Diego, CA  92101
Telephone: (619) 231-8883
Facsimile: (619) 231-8329

Attorney for KAREL SPIKES

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

KAREL SPIKES,

          Plaintiff,

vs.

EUROPEAN CAR SERVICE; ANDREW
MACIEJEWSKI; ZENNON SMOCYNSKI
and DOES 1 THROUGH 10, Inclusive,

          Defendants.

Case No.: 07 CV 2394 LAB (WMc)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REQUEST FOR ENTRY OF SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF**

**[FRCP 12(B)(1)]**

Date:   April 14, 2008
Time:   11:15 a.m.
Courtroom: 9
Judge: The Honorable Larry A.
    Burns

Plaintiff, KAREL SPIKES, (hereinafter "Plaintiff"), hereby submits the following

Memorandum of Points and Authorities in Support of his Opposition to Defendants'

Motion to Dismiss for Lack of Standing and in support of his Motion for Summary

Judgment in Plaintiff's favor.

This Opposition if based upon the Pleadings on file herein, the Declarations of

1

1   Plaintiff, Dr. R. Scott Meyer and Amy B. Vandeveld, and all exhibits thereto, which

2   accompany this Opposition.

**I.**

**DEFENDANTS' MOTION IS A FACTUAL
ATTACK AND SHOULD BE TREATED AS
A MOTION FOR SUMMARY JUDGMENT**

    A motion to dismiss under Rule 12(b)(1) can be either "factual" or "facial." *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979); 2 *Moore's Federal Practice* § 12.30 (2004). If the defendant brings a facial attack, arguing that the allegations in the complaint are insufficient to demonstrate the existence of jurisdiction, the Court's inquiry is much the same as when ruling on a motion to dismiss brought under Rule 12(b)(6). *Moore's Federal Practice* § 12.30. Specifically, the Court must assume that the factual allegations in the complaint are true and construe them in the light most favorable to the plaintiff. Id.; *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

    Where a defendant brings a "facial attack," the court's decision is based on extrinsic evidence quite apart from the pleadings. *Gould*, 220 F.3d at 176. In ruling on a facial attack, a court can consider extrinsic evidence, and generally may weigh the evidence and determine the facts in order to satisfy itself as to its power to hear the case. *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir. 1987). However, this standard does not apply to the resolution of jurisdiction questions when "issues of jurisdiction and substance are intertwined." Id.

    Where federal question jurisdiction depends on facts that are also an essential element of the federal claim, the jurisdictional and factual issues are said to be intertwined. Normally, the question of jurisdiction and the merits of an action are considered intertwined where the same statute provides the basis for both the subject matter jurisdiction and the plaintiff's substantive claim for relief. *Warren v. Fox Family*

2

*Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). Where jurisdiction is intertwined with the merits, the court "assumes the truth of the allegations in a complaint . . . unless controverted by undisputed facts in the record." *Roberts*, 812 F.2d at 1177.

A court should not resolve disputed facts where the question of jurisdiction is dependent on the resolution of the factual issues going to the merits. *Roberts*, 812 F.2d at 1177. Where there are disputed facts, the court shall apply the Fed. R. Civ. P. 56 "summary judgment standard," i.e. the moving party must establish that there are no material facts in dispute and that he or she is entitled to prevail as a matter of law. Id.

With respect to the instant motion, Defendants do not contend that Plaintiff has failed to properly allege facts establishing standing to sue under the ADA. Nor could Defendants reasonably assert such a facial challenge.[1] Instead, despite Defendants' protestations to the contrary, Defendants' Motion to Dismiss is a "factual attack", which requires a resolution of a factual dispute as to whether Plaintiff intended, at the time that he filed his Complaint, to return to the Defendants' facilities. The Defendants' Motion, then, must be treated as a Motion for Summary Judgment, which can only be granted if the material facts are undisputed. F.R.Civ.P. Rule 56(c).

///

///

---

[1] Indeed, Plaintiff has alleged that he is an individual with a disability, that he was denied full and equal access at Defendants' place of public accommodation because of Defendants' failure to remove architectural barriers, that he visited the Defendants' facilities for the purpose of availing himself of the good and services offered and provided by the public and/or for the purpose of obtaining removal of architectural barriers, that the architectural barriers will exist at Plaintiff's future visits, that he is currently being subjected to discrimination because he cannot make use of and obtain full and equal access to the facilities, goods and services offered by Defendants to the general public. Plaintiff seeks damages for each offense relating to each visit (that) Plaintiff was denied full and equal access...or was deterred from attempting to avail himself of the benefits, goods, services.... because of continuing barriers to full and equal access. (See Plaintiff's Complaint, Defendants' Exhibit "1", paragraphs 10, 13, 14 and 16.)

3

1

**II.**

2

**STANDING IS TO BE LIBERALLY CONSTRUED
IN CIVIL RIGHTS CASES**

3

4          "It is established that standing doctrine should be liberally applied in civil rights

5    cases.  As the Supreme Court taught in *Trafficante v. Metropolitan Life Insurance*, 409

6    U.S. 205, 93 S. Ct. 364, 34 L. Ed. 2d 415, in the case of a civil rights act, where private

7    enforcement suits 'are the primary method of obtaining compliance with the Act' and

8    where Congress defined discrimination broadly, Article III standing should likewise be

9    construed as broadly as possible.  (Citations omitted)." *Wilson v. Pier 1 Imports*, 413

10   F.Supp.2d 1130 (E.C. Cal. 2006); and see *Doran v. 7-Eleven, Inc.,* 506 F.3d 1191, 1198

11   (9th Cir. 2007)

12         The Supreme Court has explained that to demonstrate a "case or controversy"

13   within the meaning of Article III of the Constitution, and thus constitutional standing, a

14   plaintiff must show that:

15                (1) [he has] suffered an "injury in fact" that is (a) concrete and
                  particularized and (b) actual or imminent, not conjectural or
16                hypothetical; (2) the injury is fairly traceable to the challenged
                  action of the defendant; and (3) it is likely, as opposed to
17                merely speculative, that the injury will be redressed by a
                  favorable decision.

18

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*,

19         (S. Ct. 2000) 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610

20         The actual or threatened injury required by Article III of the United States

21   Constitution for standing to sue may exist solely by virtue of statutes creating legal rights,

22   the invasion of which creates standing.  *Havens Realty Corp. v. Coleman*, (S. Ct. 1982)

23   455 U.S. 363, 102 S. Ct. 1114.

24         In cases brought under the Americans with Disabilities Act ("the ADA"),  the

25   Ninth Circuit held that a plaintiff will satisfy the requirement that an injury be "concrete

26   and particularized" by "stating that he is currently deterred from attempting to gain

27   access" to the place of public accommodation.  *Pickern v. Holiday Quality Foods Inc.*,

28                                                4

1  293 F.3d 1133, 1137-1138 (9th Cir. 2002).   As to the requirement that a plaintiff suffer

2  an "injury in fact" the Ninth Circuit, in *Doran v. 7-Eleven, Inc.,* recently held:

> 3    Once a disabled individual has encountered or become aware
>      of alleged ADA violations that ***deter his patronage of or***
> 4    ***otherwise interfere with his access to a place of public***
>      ***accommodation***, he has already suffered an injury in fact
> 5    traceable to the defendant's conduct and capable of being
>      redressed by the courts, and ***so he possesses standing under***
> 6    ***Article III*** to bring his claim for injunctive relief forward.

7  *Doran, supra,* at 1138. (Emphasis added.)

8         In the instant case, Defendants contend that Plaintiff cannot establish the "injury in

9  fact" element of standing because Plaintiff has failed to show that he "was ever a patron

10  of Defendant's business, or will attempt to procure his services in the immediate future as

11  a matter of undisputed fact." (Defendants' Memorandum of Points and Authorities, 9:1-

12  5.)

13         As discussed more fully in Section III. C., below, however, there is no requirement

14  that a disabled person actually have previously patronized a place of public

15  accommodation in order to have standing to assert a claim under the ADA.   Rather, our

16  Ninth Circuit held that a plaintiff will have standing simply if he "encounters or becomes

17  aware of ADA violations that deter his patronage *or that otherwise interfered with his*

18  *access to a place of public accommodation.*"  Id.

19         In the instant case, the Plaintiff could not access the business office of Defendants'

20  auto repair shop because of the absence of a curb ramp or curb cut.  He could not even get

21  out of his car because there were no accessible parking spaces available and he could not

22  ensure that another vehicle would not park in such a way that he would be prevented from

23  entering and/or exiting his vehicle.  Plaintiff, then, not only was deterred from returning

24  to the facility because of these architectural barriers, but the presence of these barriers

25  interferred with his access to a place of public accommodation.  (Spikes Declaration,

26  paragraphs 25, 26 and 28.)   Thus, Plaintiff has suffered an injury in fact, giving rise to

27  standing to sue under the ADA.

28                                                    5

## III.

## TESTERS HAVE STANDING UNDER
## THE AMERICANS WITH DISABILITIES ACT

**A.    Standing Under Title II of the ADA.**

In *Tandy v. City of Wichita*, 380 F.3d 1277 (10th Cir. 2004), the Tenth Circuit held that testers had standing under Title II of the Americans with Disabilities Act ("ADA"), even where the tester's sole purpose was to determine whether defendant engaged in unlawful practices. *Tandy* at 1285.

The *Tandy* Court noted that our Supreme Court, in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374-75, 71 L. Ed. 2d 214, 102 S. Ct. 1114 (1982), emphasized the FHA § 804(d)'s use of the phrase "any person" in concluding that this statutory language created legal rights, the invasion of which constitutes the actual or threatened injury required by Article III.  The Tenth Circuit found that the language of Title II of the ADA parallels in all important respects the language of FHA § 804(d).

That is, Title II of the ADA states that "***no*** qualified individual with a disability ***shall***, by reason of such disability, be excluded from participation in . . . the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added).   The Tenth Circuit found that this plain language of Title II evinces Congress' intent to confer upon a "qualified individual with a disability" a legal right not to be excluded from participation in the services of a public entity by reason of her or his disability.  It held that Title II's words ***"no"*** and ***"shall"*** function like § 804(d)'s phrase "any person" because, read in context, "these words clearly proscribe discrimination against any person who is a 'qualified individual with a disability.'" *Tandy* at 1286.

The Tenth Circuit further held:

> The propriety of our construction of Title II's language is
> reinforced by Title II's enforcement provision.  The

6

enforcement provision extends the remedies, procedures, and rights" under the statute to "*any person* alleging discrimination on the basis of disability in violation of [Title II]." 42 U.S.C. § 12133 (emphasis added). Moreover, the ADA, like the FHA provisions at issue in *Havens Realty*, embodies a congressional intent to eradicate discrimination. See H.R. Rep. No. 101-485(II), at 22 (1990), reprinted in 1990 U.S.C.C.A.W. 303, 304 ("The purpose of the ADA is to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities . . . ."). Thus, the totality of Title II's plain language, the plain language of its enforcement provision, and the statutory scheme's anti-discriminatory purpose lead this court to conclude that Congress intended Title II to confer standing to the full limits of Article III. Cf. *Havens Realty*, 455 U.S. at 372-74. *Therefore, we hold that testers have standing to sue under Title II of the ADA*.

*Tandy* at 1286-1287. (Emphasis added.)

**B.    Title III of the ADA Creates Legal Rights for "Any Person" With a Disability.**

The plain language of Title III of the ADA, its enforcement provision and the anti-discriminatory purpose of the ADA, compel the same conclusion that testers have standing to sue under Title III of the ADA.   Just like Title II, Title III of the ADA uses the words "no" and "shall" and states that "*no* individual *shall* be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.) (Emphasis added.)

Further, the plain language of the enforcement provision of Title III parallels the language of the enforcement provision of Title II and extends "the remedies, procedures, and rights" under the statute to "*any person* who is being subjected to discrimination on the basis of disability in violation of [Title III]." 42 U.S.C. § 12188 (emphasis added). The "statutory scheme's anti-discriminatory purpose" referenced by the *Tandy* Court as applicable to Title II is contained in the "Summary of the Legislation" section of the

7

1  legislative history, which references Titles I, II and III of the ADA.  Therefore, the "anti-

2  discriminatory purpose" of the statute applicable to Title II  is likewise applicable to Title

3  III of the ADA. (See H.R. Rep. No. 101-485(II), at 22-23 (1990), reprinted in 1990

4  U.S.C.C.A.W. 303, 304).

5         Thus, the totality of Title III's plain language, the plain language of its enforcement

6  provision, and the statutory scheme's anti-discriminatory purpose compel the conclusion

7  that Congress intended Title III to confer standing to the full limits of Article III,

8  including to testers.

9  **C.    Title III Standing Is Not Limited to "Customers" and "Clients".**

10        More on point, our Ninth Circuit, in *Molski v. M.J. Cable, Inc.*, 481 F.3d 724 (9th

11  Cir. 2007), held that a person need not even have been a customer or client of a public

12  accommodation to be able to recover under Title III of the ADA.

13          Title III's broad general rule contains no express 'clients or
             customers' limitation . . . ." (Citing *PGA Tour v. Martin, 532*
14           *U.S. 661, 678-79, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001).*)
             Aside from being inapplicable to subsection (a)'s general
15           prohibition, the limited definition of "individual" in §
             12182(b)(1)(A)(iv) is also inapplicable to §
16           12182(b)(2)(A)(iv), which *defines discrimination to include*
             *the failure to remove architectural barriers*.

17

18           This interpretation is in accord with at least one other circuit.
             In *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113,
19           122 (3d Cir. 1998), the Third Circuit held that Title III applied
             to a medical doctor working as an independent contractor at a
20           hospital, *despite the fact that he was neither a client nor a*
             *customer, nor even a member of the general public*. The
21           court concluded that "both the language of Title III and its
             legislative history clearly demonstrate [that] the phrase 'clients
22           or customers,' which only appears in 42 U.S.C. §
             12182(b)(1)(A)(iv), is not a general circumscription of Title
23           III and cannot serve to limit the broad rule announced in 42
             U.S.C. § 12182(a)." Id. at 121. Rather, the court noted, "[t]he
24           operative rule announced in Title III speaks not in terms of
             'guests,' 'patrons,' 'clients,' 'customers,' or 'members of the
25           public,' but instead broadly uses the word 'individuals.'" Id.

26           **Accordingly, Molski did not need to have been a client or customer of**
             **Cable's to be an "individual" entitled to the protections of Title III.**
27           **One need not be a client or customer of a public accommodation to feel**

28                                                  8

1          **the sting of its discrimination.**

2   *Molski, supra,* at 733. (Emphasis added.)

3          In the instant case, then, Plaintiff need not have been a past customer, nor need he

4   even be a prospective customer of Defendants, in order to have standing to enforce Title

5   III of the ADA.  Instead, all Plaintiff need show is that he suffered an injury in fact when

6   he encountered or became aware of ADA violations that deterred his patronage ***"or that***

7   ***otherwise interfered with his access to a place of public accommodation.*"**  *Doran,*

8   *supra,* at 1138.

9   **D.     Tester Standing Furthers the Congressional**
    **        Intent to Eradicate Discrimination.**
10

11          The extension of standing to individuals with disabilities who serve as testers fully

12   comports with the purpose and intent of the ADA.  The ADA is intended to be broadly

13   construed.  "In fact, one of the Act's 'most impressive strengths' has been identified as its

14   'comprehensive character' ... and accordingly the Act has been described as 'a milestone

15   on the path to a more decent, tolerant, progressive society.'" *PGA Tour, Inc. v. Martin*,

16   532 U.S. 661, 675; 121 S. Ct. 1879 (S. Ct. 2001).  The phrase "public accommodation" is

17   defined in terms of 12 extensive categories, which the legislative history indicates "should

18   be construed liberally" to afford people  with disabilities "equal access" to the wide

19   variety of establishments available to the nondisabled.  *PGA Tour, Inc. v. Martin*, supra,

20   676-677.

21          In fact, the ADA itself identifies "places of public accommodation" to include

22   facilities that individuals typically would not "plan to return to" in the imminent future

23   simply to avail themselves of the goods and services of the place of public

24   accommodation.

25          For example, the ADA includes the following as "places of public

26   accommodation" -  funeral parlors, offices of a lawyer, homeless shelters, travel services,

27   shoe repair services, hospitals and adoption agencies.  Further, the general descriptive

28                                                      9

categories of "places of public accommodation" include "sales and rental establishments" and "service establishments". 42 U.S.C. § 12181(7). These general categories would include emergency rooms, automobile sales lots, all manner of repair shops, eye laser surgery clinics, automobile body shops and tow yards. All of these places of public accommodation are types of facilities that individuals with disabilities typically would not "plan to return to" for future goods, services, etc.

An emergency is "an unforeseen combination of circumstances or the resulting state that calls for immediate action." Merriam-Webster Online, www.webster.com. People do not typically "plan" to go to emergency rooms, let alone plan to return to them. They go there because of "unforeseen" circumstances. People do not plan for their computers to crash, their vacuum cleaners to "go on the fritz", their cameras or DVD recorders or players to break. People do not "plan" the circumstances that would lead to a need to visit a repair shop for repairs.

With respect to funeral parlors, people typically go as guests of the living and/or to remember the "dear departed." The deaths giving rise to the visits are, thankfully, not typically planned in advance. After the funeral service giving rise to the first visit, no one "intends to return" to a funeral parlor unless, by some coincidence, the person has contemporaneously lost multiple loved ones whose services will be held at the same funeral parlor on different days, close in time to each other. Or unless the person is omniscient or prescient and can foretell the deaths of others and can tell where their funeral services will be held. Or unless the person has pre-arranged his or her funeral and "plans to return" as the deceased. In that event, accessibility is a non-issue. And yet, funeral parlors are specifically identified as "places of public accommodation" governed by the ADA.

People typically do not plan to have to visit tow yards the first time, nor do they purposely have their vehicles towed a second time so that they can "intend to return" to tow yards. People do not "intend to return" to homeless shelters. Rather, they plan to

10

*leave* homeless shelters.  People who have adopted children do not typically "plan to return" to the adoption agency in the imminent future to adopt another child close in time to the first adoption.  People do not intentionally re-break their watches or televisions so that they can "plan to return" to repair shops for additional repairs.  They do not purposely take broken items one at a time so that they will have an intent to re-visit a repair shop in the imminent future.

For most people, visits to car sales lots are for the express purpose of purchasing one and only one vehicle.  If a person in a wheelchair visits an inaccessible car sales lot on a particular day and purchases a vehicle that day because of an imminent need for transportation, the person does not typically plan to purchase a second, expensive and unnecessary vehicle at the same lot on a later date.  They may plan to return to the lot so that they can compel removal of architectural barriers.  But it would be rare for most people either to delay the purchase of a vehicle, or to purchase two vehicles on different days, so that they will satisfy the "intent to return" as defined by Defendants.

To be sure, it seems to be common experience that most people do not purchase vehicles more often than once every five or so years, if that frequently.  Mr. Spikes is clearly an exception to this rule and visits auto sales lots quite frequently to peruse the merchandise for potential purchases.   But Congress could not have intended that exceptions like Mr. Spikes are the only people with standing to sue for barrier removal.

Single people do not purchase mattresses and then "plan to return" to the mattress store in the imminent future to purchase another mattress for a second bed they do not own.  Indeed, mattresses are typically sold with warranties lasting 7 to 10 years.  If a person actually purchases a mattress, it would be highly unlikely that they would return to the mattress store for another 7 to 10 years, unless they were returning to compel removal of architectural barriers.

People do not go to auto body shops and have their dents repaired, then purposely damage their vehicles again so they can "plan to return" to the shop.  Nor do they

11

typically find a facility is inaccessible and then delay repairs for a year or more while they litigate an ADA enforcement action.  People do not plan to be sued so that they will have to hire a lawyer and have a reason for returning to the lawyer's office.  People typically do not have laser surgery on their eyes more than one time.

If mattress stores, car sales lots, emergency rooms, repair shops, laser surgery clinics and funeral parlors are inaccessible to wheelchair users, Congress could not have intended that wheelchair users must plan other emergencies/deaths/breakdowns of items/unnecessary eye surgeries just so they will have the "intent to return" that satisfies the standing definition urged by Defendants.

Unless standing to enforce the ADA is extended to testers, the ADA can never be enforced with respect to virtually all repair facilities, tow yards, emergency rooms, funeral parlors, homeless shelters, adoption agencies, auto body shops, automobile sales lots, mattress stores, or any other place of public accommodation to which people do not typically "plan to imminently return to" for goods and services.  This could not have been the intent of Congress when it broadly described the types of facilities to which the ADA applies and when it purposely declined to limit enforcement actions only to "customers and clients."  Instead, standing must be conferred on people with disabilities, including testers, solely because the ADA creates legal rights, the invasion of which creates standing.

If the ADA confers standing solely on people who intend to return to facilities as customers and clients, myriad places of public accommodation, which are intended to be embraced by the broad language of the ADA, would never have to be accessible to people with disabilities.

///

///

///

///

12

## IV.

### PLAINTIFF'S CLAIM AGAINST
### DEFENDANTS IS MERITORIOUS

**A.    Plaintiff Is Disabled.**

Plaintiff is a person with a disability.  He has at least three conditions which substantially impair his ability to walk, stand, climb stairs and negotiate curbs: a) traumatic above-knee amputation of the right lower extremity; b) chronic instability of the left knee due to knee dislocation; and c) drop-foot due to permanent neurological injury at the left knee.  (Declaration of R. Scott Meyer, M.D.)

Plaintiff requires the use of a wheelchair for mobility, which was prescribed for him by Dr. Meyer, because of the above-identified medical conditions.  Without a wheelchair, Plaintiff would be substantially limited in his every day activities because he cannot walk without great difficulty and pain, nor can he stand for more than fifteen to twenty minutes without great difficulty and pain. (Declaration of R. Scott Meyer, M.D.)

While Plaintiff can walk, if wearing a prosthesis, his gait is severely imbalanced and unsteady, due to the drop-foot in his left lower extremity, his unstable left knee, and the pain associated with the use of his prosthesis.  These conditions also severely limit the distance he is able to walk.  Further, his drop-foot condition, his left knee instability and the use of his prosthesis, make it difficult, if not impossible, for Plaintiff to negotiate curbs and/or stairs unless there are railings or other supportive features available.  Plaintiff's treating orthopedist strongly recommended that Plaintiff avoid negotiating stairs or curbs, while walking, unless he has adequate support. (Declaration of R. Scott Meyer, M.D.)

Plaintiff also suffers from "phantom pains" associated with his amputated extremity.  Dr. Meyer has treated Plaintiff for debilitating phantom pains. (Declaration of R. Scott Meyer, M.D.)

**B.    Plaintiff Sought the Services of Defendants.**

Defendants admit that Plaintiff sought a "quote to service his car."  Defendants

13

1    admit that "clients do not frequently visit the property."  Defendants admit that they

2    provide written estimates for services.  (Smoczynski Declaration, pars. 3, 8, 13.)   It is

3    undisputed, then, that Plaintiff visited the facility and that he sought an estimate for

4    services.

5    **C.    Defendants' Public Accommodation Is Inaccessible.**

6          Defendants operate a place of public accommodation, a "mechanics garage", which

7    provides automotive services to the public.  (Declaration of Zenon Smoczynski,

8    paragraphs 1 through 8.)  "Service establishments" are defined as "places of public

9    accommodation".  28 C.F.R. §36.104.

10         At the time of Mr. Spikes' visit to the Defendants' facilities, there were no parking

11   spaces reserved for people with disabilities.  Nor was there an accessible path of travel to

12   the office.  The walkway in front of the office is raised and there is no curb ramp, curb cut

13   or hand rail at the raised walkway.  Mr. Spikes was unable to exit his vehicle and to travel

14   to the office because of the absence of an accessible parking space and the absence of an

15   accessible path of travel to the office.  (Declaration of Karel Spikes, paragraphs 25, 26 and

16   28).

17                                          **V.**

18                          **PLAINTIFF SUFFERED AN INJURY**
                                        **IN FACT**
19

20         As noted above, a disabled individual who "encounters or becomes aware of ADA

21   violations that deter his patronage *or that otherwise interfered with his access to a place*

22   *of public accommodation*" has suffered "an injury in fact." *Doran, supra,* at 1138.

23   Similarly, a plaintiff who is threatened with harm in the future because of existing or

24   imminently threatened non-compliance with the ADA suffers "imminent injury." *Pickern*

25   *v. Holiday Quality Foods Inc*. 293 F.3d 1133, 1138 (9th Cir. 2002).

26         Standing does not require that a plaintiff frequently return to a facility and suffer

27   repeated abuse in order to obtain standing.  Nothing in the ADA requires a person with a

28                                          14

disability to engage in a futile gesture if the person has actual notice of a barrier to access. *Feezor v. Chico Lodging, LLC*, 422 F. Supp. 2d 1179 (E.D. Cal. 2006). In the absence of an accessible parking space, a person with a disability is not required to actually exit his vehicle in order to have suffered full and equal access to a place of public accommodation. *Botosan v. McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000).

In the instant case, Plaintiff owns a 1997 Mercedes Benz stations wagon. (Spikes Declaration, paragraph 16). Defendants specialize in servicing European automobiles, including Mercedes Benz vehicles. (Smoczynski Declaration, paragraph 3; Exhibits to Spikes Declaration, photographs 1 through 4.) Plaintiff went to European Car Service repair shop because he wanted to have his 1992 Mercedes Benz tuned up. The car was running rough and he wanted to find a reasonably priced repair shop. (Spikes Declaration, par. 22.)

He went to European Car Service and two other facilities looking for a tune up for his Mercedes. He went to European Car Service first to see if they could fix his car and, if so, what the cost would be. He was not able to get an estimate for repairs, so the next day, he went to the Auto Center. The Auto Center pointed him to another facility, which he later visited. The accessible space at the other facility was blocked by vehicles being repaired and he could not park his car there. Ultimately, his Mercedes was repaired by his neighbor who performed the work at his apartment parking space. (Spikes Declaration, pars. 23, 24).

European Car Service had no accessible parking space. If Plaintiff can park in an accessible spot, no one can park too close to him, so he can then open his car door all the way. He needs to fully open his door because of his drop foot and prosthesis. Even at his apartment, he parks his vehicles next to each other, and far enough away from each other, so that he can open the Mercedes' door all the way. In fact, he backs his Mercedes into his parking space so that his driver's door is next to his other car. This is evident in the photos included in Defendants' Exhibit "5" to their Motion. The vehicle to the right of the

15

Mercedes is an SUV that Plaintiff also own.  He backs the SUV into its space so that the driver's door is adjacent to the ramp located to the right of that second space.  That ramp leads to a level walkway that leads to the Plaintiff's apartment. (Spikes Declaration, par. 24).

At European Car Service, the Plaintiff called out to a man who said he was the owner of the business and the Plaintiff told him his car was running rough.  Mr. Spikes asked if the man could look at his car and give him an estimate, but the man said that he was too busy and he refused to tell the Plaintiff when he would have some time to look at the car.  Mr. Spikes has monitored the facility during the course of this lawsuit and no modifications have been made as of March 5, 2008.   At European Car Service, he was not able to exit his vehicle or get into the office because of the absence of an accessible parking space and a ramp. (Spikes Declaration, par. 25).

## VI.

### PLAINTIFF IS COMMITTED TO COMPELLING REMOVAL OF ARCHITECTURAL BARRIERS

When the Plaintiff filed his lawsuit against European Car Service, and even today, he intended to return to the repair shop.  First, he wants to compel European Car Service to remove architectural barriers, as required by the ADA.  He wants to be able to park his car in an accessible spot and walk or roll into the office, like other non-disabled people.  Since his Mercedes is about 16 years old, it requires regular maintenance.  He wants to be able to take it to low-cost repair shops that specialize in Mercedes vehicles.  Ultimately he may learn that European's repair costs are quite reasonable or he may learn that they are outside of his budget, but he will never have that opportunity if I cannot even get out of my car at the repair shop.  (Spikes Declaration, paragraph 26).

Mr. Spikes' stated intention to return to the Defendants' business to compel compliance with the ADA is not mere conjecture, but is supported by his prior conduct. All of his cases that have resolved thus far, were resolved by way of settlement.  Before he

16

1  will settle a case, he demands the business and property owners remove architectural

2  barriers. (Spikes Declaration, par. 7 and Exhibit "1" to Spikes Declaration).

3      While he typically also seeks damages, fees and costs in his cases, he has never

4  settled a case for just money.  In fact, in several cases he has waived his claims for

5  damages, fees and costs, or he has agreed to greatly reduced amounts for damages, fees

6  and costs so that the business owner could make required modifications to their facilities.

7  Most of the Settlement Agreements he has entered into are confidential with respect to the

8  amount of money paid to him.  In each of these cases, the Defendants agreed to make

9  substantial modifications to their properties to provide accessibility for people with

10  disabilities.  (Spikes Declaration, par. 8).

11      He believes that requiring defendants to pay money is an important tool to compel

12  compliance with access laws.  If business and property owners think they can delay

13  complying with the ADA because there are no real consequences to them, they will have

14  no incentive to make modifications sooner rather than later.  In every case, his attorney

15  and he endeavor to obtain agreements by business and property owners to perform specific

16  modifications by specific dates. (Spikes Declaration, par. 9)

17      Not only does the Plaintiff fight for barrier removal, he makes an effort to ensure

18  that barriers are actually removed.  He frequently monitors the status of the facilities he

19  sues during the course of litigation and he routinely re-visits facilities following settlement

20  of his cases to ensure that modifications were properly performed.  If, post-settlement, he

21  finds that a business has not made the modifications that it had agreed to make, he notifies

22  his attorneys, including Amy B. Vandeveld. (Spikes Declaration, par. 11). Ms. Vandeveld

23  then contacts the business' or property owners' attorneys to demand that they comply with

24  the Settlement Agreements' required modifications. (Vandeveld Declaration, par. 3).

25      Most recently, about a week before the European Car Service Defendants filed their

26  Motion to Dismiss in the instant case, Mr. Spikes re-visited Sundance Market to confirm

27  whether the modifications had been made that were required by our Settlement

28                                     17

Agreement.  He found that the modifications were inappropriate and he took photographs for his attorney, which he had printed on March 5, 2008, *two days before* the Defendants' Motion to Dismiss was filed and served.  Attached to the Plaintiff's Declaration as Exhibit "2" are true and correct copies of the front and back of two photographs that he took at Sundance Market on his recent visit, showing the print date-stamp on the back of the photographs. (Spikes Declaration, par. 12).

Given the fact that at least one of the facilities he sued had originally complied with the Settlement Agreement and then relocated the space a few years later without providing a required access aisle, Mr. Spikes has spent the last several months again re-visiting businesses to determine if any have since failed to maintain the accessibility of their facilities.   He has re-visited virtually every facility, including the out-of-town motels, to check on the modifications. (Spikes Declaration, par. 15).  Mr. Spikes' attorney, Ms. Vandeveld, is also committed to compelling compliance with the ADA and to removal of architectural barriers.  (See Vandeveld Declaration, pars. 2 - 15).

**VII.**

**MR. MACIEJEWSKI SHOULD BE REQUIRED
TO APPEAR BEFORE THIS COURT TO DISPUTE SERVICE**

A declaration was submitted by someone claiming to be Mr. Maciejewski, who declares that service of the Complaint was not effected on him. Because Defendants' attorney represented, not more than two months ago, that Mr. Maciejewski's whereabouts were "unknown", the genuineness of the declaration is suspect. (See Defendants' Exhibit "10", paragraph 2).  After being apprised of the contested service, registered process server, Greg Cole, declared that he served a gentleman who represented himself as Andrew Maciejewski.  (See Defendants' Exhibit "2".)  Given the dispute, the Court should order both Mr. Maciejewski and Mr. Cole to an evidentiary hearing to resolve this issue.

///

///

18

**VIII.**

**CONCLUSION AND REQUEST FOR ENTRY OF
SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR**

Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety and that the Court enter summary judgment in favor of Plaintiff.

DATED: April 1, 2008                    LAW OFFICES OF AMY B. VANDEVELD


                                        S/ AMY B. VANDEVELD
                                        Attorney for Plaintiff
                                        Email: abvusdc@hotmail.com

19