Amy B. Vandeveld, SBN 137904
LAW OFFICES OF AMY B. VANDEVELD
1850 Fifth Avenue, Suite 22
San Diego, CA  92101
Telephone: (619) 231-8883
Facsimile: (619) 231-8329

Attorney for KAREL SPIKES

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREL SPIKES,<br><br>  Plaintiff,<br><br>vs.<br><br>EUROPEAN CAR SERVICE; ANDREW MACIEJEWSKI; ZENNON SMOCYNSKI and DOES 1 THROUGH 10, Inclusive,<br><br>  Defendants. | Case No.: 07 CV 2394 LAB (WMc)<br><br>**DECLARATION OF KAREL SPIKES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>[FRCP 12(B)(1)]<br><br>Date: April 14, 2008<br>Time: 11:15 a.m.<br>Courtroom: 9<br>Judge: The Honorable Larry A. Burns |

I, KAREL SPIKES, declare:

1.  I am the Plaintiff in the instant action. I am a resident of the County of San Diego, State of California and I have personal knowledge of the following facts. If called as a witness, I could and would competently testify to the following:

2.  I have at least three conditions which substantially impair my ability to walk, stand, climb stairs and negotiate curbs: a) traumatic above-knee amputation of the right lower extremity; b) chronic instability of the left knee due to knee dislocation; and c) drop-foot due to permanent neurological injury at the left knee.

3.  I was prescribed a wheelchair because I cannot walk without great difficulty

1  and pain, nor can I stand for more than fifteen to twenty minutes without great difficulty
2  and pain.
3       4.     While I can walk, if wearing a prosthesis, my gait is severely imbalanced
4  and unsteady, due to my disabilities. These conditions also severely limit the distance I
5  am able to walk. Further, my disabilities make it difficult, if not impossible, for me to
6  negotiate curbs and/or stairs unless there are railings or other supportive features
7  available.
8       5.     I suffer from "phantom pains" associated with my amputated extremity. I
9  have been treated for debilitating phantom pains.
10      6.     I sued a number of businesses and property owners in the San Diego County
11  area, along with a few places outside of the San Diego County area, because of
12  architectural barriers that prevent people with mobility impairments, including myself,
13  from obtaining full and equal access to these places of public accommodation.
14      7.     All of my cases that have resolved thus far, were resolved by way of
15  settlement. Before I will settle a case, I require the business and property owners to
16  remove architectural barriers. Attached hereto collectively as Exhibit "1" are copies of
17  pertinent pages of three non-confidential Settlement Agreements, which illustrate the
18  modifications I typically require of Defendants. There have been only a few instances in
19  which modifications were not presently required under the Settlement Agreement because
20  the business was no longer operational or the business was going to cease operations in
21  the near future. In those cases, I typically required that the business and property owners
22  agree to remove architectural barriers before the re-opening of the business, if that
23  occurred, or before another business opened for business at the particular site. For
24  example, I was advised during my lawsuit that Steve's Cabana Bar would likely close
25  after I filed my lawsuit. We still agreed, in the Settlement Agreement, that if the business
26  re-opened at the property, it would remove architectural barriers before re-opening.
27  During the lawsuit against 99 Cent Variety Store on University Avenue, the Defendant
28

represented that it intended to cease doing business in the near future. In our Settlement Agreement, the Defendant agreed to make repairs to the interior of the facility if it continued to operate at the property.

8. While I typically seek damages, fees and costs in my cases, I have never settled a case for just money. In fact, in several cases I have waived my claims for damages, fees and costs, or I have agreed to greatly reduced amounts for damages, fees and costs so that the business owner could make our required modifications to their facilities. Most of the Settlement Agreements I have entered into are confidential with respect to the amount of money paid to me because, it is my understanding, this is a term of settlement required by most defendants. Generally, however, I have settled almost one-quarter of my cases for $4,000.00 or less for damages, attorneys fees and costs. In one-quarter of these cases, I settled for $2,500.00 or less for damages, fees and costs. In at least one case, I settled for costs only and in another, I waived all monetary claims so that modifications could be made to the properties. In each of these cases, the Defendants agreed to make substantial modifications to their properties to provide accessibility for people with disabilities.

9. I believe that requiring defendants to pay money is an important tool to compel compliance with access laws. If business and property owners think they can delay complying with the ADA because there are no real consequences to them, they will have no incentive to make modifications sooner rather than later. In every case, my attorney and I endeavor to obtain agreements by business and property owners to perform specific modifications by specific dates.

10. For each facility that I sued, at the time I filed each of the lawsuits, and even after the lawsuits were settled, I intended to return to the facility either to compel compliance with the ADA and/or to obtain the goods, services, benefits and privileges provided by the business.

11. Not only do I fight for barrier removal, I make an effort to ensure that

barriers are actually removed. I frequently monitor the status of the facilities I sue during the course of litigation and I routinely re-visit facilities following settlement of my cases to ensure that modifications were properly performed. If, post-settlement, I find that a business has not made the modifications that it had agreed to make, I notify my attorneys, including Amy B. Vandeveld. It is my understanding that Ms. Vandeveld then contacts the business' or property owners' attorneys to demand that they comply with the Settlement Agreements' required modifications.

12. Most recently, about a week before the European Car Service Defendants filed their Motion to Dismiss in this case, I re-visited Sundance Market to confirm whether the modifications had been made that were required by our Settlement Agreement. I found that the modifications were inappropriate and I took photographs for my attorney, which I had printed on March 5, 2008, *two days before* the Defendants' Motion to Dismiss was filed and served. Attached hereto as Exhibit "2" are true and correct copies of the front and back of two photographs that I took at Sundance Market on my recent visit, showing the print date-stamp on the back of the photographs.

13. To the best of my recollection, some of the facilities that I re-visited to compel ADA compliance, that still had barriers after our settlement, were: Murphy's Market, Corner Liquor, San Altos Liquor, Big K Market, Western Towing and Food Center. I was represented by Mark Potter with respect to the Food Center matter. I advised Mr. Potter that the Food Center had not complied with our Settlement Agreement and it is my understanding that he contacted the defendants' attorney in that case since accessibility modifications were later made to that store.

14. Further, despite my re-visits to ensure compliance, at least one business continued to flout access laws and our Settlement Agreement. Murphy's Market originally did not comply with our Agreement and did not install an accessible parking space as was required. I understand that my attorney, Ms. Vandeveld, wrote a letter to the defendant's attorney and an accessible parking space was installed, as required by the

1  Agreement. The space was located across the parking lot from the entrance, away from
2  the building, and adjacent to the sidewalk, because the business owner wanted to be able
3  to utilize a side door that would have been blocked if the accessible parking space were
4  located next to the building. Two years later, in 2007, I again re-visited the facility, and
5  the business appeared to have moved the accessible parking space next to the building,
6  but the new space had no required access aisle. I took photographs, which I provided to
7  my attorney and it is my understanding that she wrote another letter to the defense
8  attorney. The current accessible parking space is now next to the building, with an access
9  aisle. It is not in the same location as originally installed, but it is closer to the entrance
10 and is acceptable to me. The original accessible parking space has been abandoned, the
11 signs have been removed and the striping allowed to fade. But for my re-visits and my
12 attorney's letters, the current space would have had no access aisle.
13         15.    Given the fact that Murphy's originally complied with the Settlement
14 Agreement and then relocated the space a few years later without providing a required
15 access aisle, I have spent the last several months again re-visiting businesses to determine
16 if any have since failed to maintain the accessibility of their facilities. I have re-visited
17 virtually every facility, including the out-of-town motels, to check on the modifications.
18         16.    With respect to my lawsuits against car repair and car sales facilities, I am a
19 car fanatic. I love cars. In the past ten years I have owned several different cars. Most of
20 them are older vehicles that have required regular maintenance and frequent repairs.
21 Since becoming disabled, I have owned a 1987 Maxima, 1984 300ZX, 1977 Cadillac
22 Seville, two 1978 Cadillac Seville (although not at the same time) and 1979 Cadillac
23 Seville and a late 1970's Chevy Chevette. I currently own a 1997 Ford Expedition (with
24 248,000 miles on it) and a 1992 Mercedes station wagon. My experience, having been a
25 longtime car owner and having been an automotive parts and sales technician, is that
26 smaller repair shops do not charge as much as dealerships. This is why I try to visit
27 smaller shops when looking for estimates and repairs for my vehicles. I have always
28

been, and intend to continue to be, a comparison shopper. I look for the best service at the lowest cost. In fact, I visited another repair shop that specifically specializes in Mercedes Benz repairs around the time of my visit to European Car Service. The other facility had an accessible parking space, but it was blocked by repair vehicles, and I have not yet filed a lawsuit against it.

17. I initially visited the facilities listed in Defendants' Exhibit "7" for the purpose of obtaining information about repair services and parts and to get estimates for repairs. For example, I wanted to visit MD Auto Repair to compare prices for tires and rims for my SUV. I wanted to visit JD Collision Center because my Mercedes' spoiler was cracked and needed to be repaired and I wanted to determine if they perform that sort of work. I wanted to visit Precision Motors to get prices on tune-ups and oil changes for regular maintenance on my SUV. I have already monitored these facilities, after I filed the lawsuit, and I intend to return to each of these facilities in June of 2008. While I cannot disclose the terms of my Settlement Agreement with those business owners and property owners, I am hopeful that each of these facilities will be accessible to people with disabilities in June of 2008. All of the facilities are relatively close to my home in Spring Valley and are located in a commercial area that is like an "auto shop alley", where car owners can get multiple estimates from multiple repair and auto facilities. I intend to return to these facilities to ensure that they are accessible to people with disabilities so that I have the option of utilizing their services and purchasing their goods in the future.

18. TNT Auto Sales is an auto sales lot, which I visited in April of 2007. I am always interested in looking at, pricing and potentially purchasing other vehicles, as is evidenced by my car ownership history. I often go to automobile sales lots to see what is for sale, as well as to compare the prices of the inventory. I intend to re-visit TNT Auto Sales shortly after they complete the reconstruction of their facility and the pavement of their lot, which I understand will occur in the near future.

19. I visited the Auto Center to see if I could get an estimate for a tune-up on my Mercedes. At that time, I was actually directed by an Auto Center employee to another shop that specializes in Mercedes Benz cars. I intend to return to the Auto Center to compel compliance with the ADA. Also, my SUV receives an oil change almost every three months. I intend to re-visit the Auto Center, when it is accessible, to determine if their prices are competitive and, if so, to get an oil change.

20. I went to Import Auto Body around the same time as my visits to JD Collision, Precision Motors, MD Auto Repair and the Auto Center. As with JD Collision, I hoped to get an estimate for the repair of my Mercedes Benz spoiler. I spoke with a man of Asian descent who told me that he was not able to give me an estimate at that time. He gave me a card and requested that I call for an appointment. I could not get out of my car because there was no accessible parking space. I have not returned to the facility since my first visit because it is not accessible. I intend to return to Import Auto Body after I am advised that modifications have been made so that I can determine if the facility has, in fact, complied with the ADA. I also want to customize the fender flares on my Mercedes, so I would like to return to determine if they perform this sort of work and, if so, the cost. If the cost is reasonable, I would like to have Import Auto Body perform the work.

21. I want the same opportunities that non-disabled people have for car repairs. I want to be able to shop around, get various estimates, and have my car fixed at a reasonably priced, qualified facility. I do not have that opportunity if the car repair facility or auto sales center does not even have an accessible parking space for my use. I have returned to each of the facilities that I have sued that have not yet agreed to make accessibility modifications to monitor their status. I also intend to return to each of the facilities to compel compliance with the ADA.

22. With respect to the European Car Service business, I went to this repair shop because I wanted to have my 1992 Mercedes Benz tuned up. The car was running

1 rough and I wanted to find a reasonably priced repair shop.

2   23.   I actually went to European Car Service and two other facilities looking for a tune up for my Mercedes. I went to European Car Service first to see if they could fix my car and, if so, what the cost would be. I was not able to get an estimate for repairs, so the next day, I went to the Auto Center. The Auto Center pointed me to another facility, which I later visited. I knew that a neighbor of mine worked at the other facility, but I never knew where the other facility was located. When I was directed to the other facility by the Auto Center, I was able to talk with my neighbor about getting an estimate at that other facility. The accessible space at the other facility was blocked by vehicles being repaired and I could not park my car there. Also, they were busy and I was given a card to call back to schedule an appointment. Ultimately, my Mercedes was repaired by my neighbor who performed the work at my apartment parking space.

  24.   European Car Service had no accessible parking space, nor did the Auto Center. The other facility had an accessible space but it was blocked by repair vehicles. If I can park in an accessible spot, no one can park too close to me, so I can then open my car door all the way. I need to fully open my door because of my drop foot and prosthesis. Even at my apartment, I park my vehicles next to each other, and far enough away from each other, so that I can open the Mercedes' door all the way. In fact, I back my Mercedes into my parking space so that my driver's door is next to my other car. This is evident in the photos included in Defendants' Exhibit "5" to their Motion. The vehicle to the right of my Mercedes is an SUV that I also own. I back the SUV into its space so that the driver's door is adjacent to the ramp located to the right of that second space. That ramp leads to a level walkway that leads to my apartment.

  25.   At European Car Service, I called out to a man who said he was the owner of the business and I told him my car was running rough. I asked if he could look at my car and give me an estimate, but he told me that he was too busy and he refused to tell me when he would have some time to look at my car. I have monitored the facility during the

course of this lawsuit and no modifications have been made as of March 5, 2008. At European Car Service, I am not able to exit my vehicle or get into the office because of the absence of an accessible parking space and a ramp.

26. When I filed my lawsuit against European Car Service, and even today, I intended to return to the repair shop. First, I want to compel European Car Service to remove architectural barriers, as required by the ADA. I want to be able to park my car in an accessible spot and walk or roll into the office, like other non-disabled people. Since my Mercedes is about 16 years old, it requires regular maintenance. I want to be able to take it to low-cost repair shops that specialize in Mercedes vehicles. Ultimately I may learn that European's repair costs are quite reasonable or I may learn that they are outside of my budget, but I will never have that opportunity if I cannot even get out of my car at the repair shop.

27. I am committed to making my world more accessible for me and for others with disabilities. Not only do I file lawsuits when I find facilities are not accessible, but I also follow up to ensure that barriers are removed. I have spent my own money on gas and photographs re-visiting businesses after lawsuits were settled simply because accessibility is important to me.

28. Attached hereto as Exhibit "3" are photographs of the parking lot and walkway at European Car Service. These photos accurately depict the conditions that I observed on July 10, 2007 during my first visit and on March 5, 2008 when I drove past the facility to monitor its status. There was no ramp at the walkway and there were no accessible parking spaces in the lot during either of my visits to the property.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 3-31 day of March, 2008 at San Diego, California.

_____
KAREL SPIKES

```
 1  Amy B. Vandeveld, SBN 137904
    LAW OFFICES OF AMY B. VANDEVELD
 2  1850 Fifth Avenue, Suite 22
    San Diego, CA  92101
 3  Telephone: (619) 231-8883
    Facsimile: (619) 231-8329
 4
    Attorney for KAREL SPIKES
 5
```

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREL SPIKES,<br><br>    Plaintiff,<br><br>vs.<br><br>EUROPEAN CAR SERVICE; ANDREW MACIEJEWSKI; ZENNON SMOCYNSKI and DOES 1 THROUGH 10, Inclusive,<br><br>    Defendants. | Case No.: 07 CV 2394 LAB (WMc)<br><br>**DECLARATION OF KAREL SPIKES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>[FRCP 12(B)(1)]<br><br>Date: April 14, 2008<br>Time: 11:15 a.m.<br>Courtroom: 9<br>Judge: The Honorable Larry A. Burns |

I, KAREL SPIKES, declare:

1. I am the Plaintiff in the instant action. I am a resident of the County of San Diego, State of California and I have personal knowledge of the following facts. If called as a witness, I could and would competently testify to the following:

2. I have at least three conditions which substantially impair my ability to walk, stand, climb stairs and negotiate curbs: a) traumatic above-knee amputation of the right lower extremity; b) chronic instability of the left knee due to knee dislocation; and c) drop-foot due to permanent neurological injury at the left knee.

3. I was prescribed a wheelchair because I cannot walk without great difficulty

and pain, nor can I stand for more than fifteen to twenty minutes without great difficulty and pain.

4. While I can walk, if wearing a prosthesis, my gait is severely imbalanced and unsteady, due to my disabilities. These conditions also severely limit the distance I am able to walk. Further, my disabilities make it difficult, if not impossible, for me to negotiate curbs and/or stairs unless there are railings or other supportive features available.

5. I suffer from "phantom pains" associated with my amputated extremity. I have been treated for debilitating phantom pains.

6. I sued a number of businesses and property owners in the San Diego County area, along with a few places outside of the San Diego County area, because of architectural barriers that prevent people with mobility impairments, including myself, from obtaining full and equal access to these places of public accommodation.

7. All of my cases that have resolved thus far, were resolved by way of settlement. Before I will settle a case, I require the business and property owners to remove architectural barriers. Attached hereto collectively as Exhibit "1" are copies of pertinent pages of three non-confidential Settlement Agreements, which illustrate the modifications I typically require of Defendants. There have been only a few instances in which modifications were not presently required under the Settlement Agreement because the business was no longer operational or the business was going to cease operations in the near future. In those cases, I typically required that the business and property owners agree to remove architectural barriers before the re-opening of the business, if that occurred, or before another business opened for business at the particular site. For example, I was advised during my lawsuit that Steve's Cabana Bar would likely close after I filed my lawsuit. We still agreed, in the Settlement Agreement, that if the business re-opened at the property, it would remove architectural barriers before re-opening. During the lawsuit against 99 Cent Variety Store on University Avenue, the Defendant

represented that it intended to cease doing business in the near future. In our Settlement Agreement, the Defendant agreed to make repairs to the interior of the facility if it continued to operate at the property.

8. While I typically seek damages, fees and costs in my cases, I have never settled a case for just money. In fact, in several cases I have waived my claims for damages, fees and costs, or I have agreed to greatly reduced amounts for damages, fees and costs so that the business owner could make our required modifications to their facilities. Most of the Settlement Agreements I have entered into are confidential with respect to the amount of money paid to me because, it is my understanding, this is a term of settlement required by most defendants. Generally, however, I have settled almost one-quarter of my cases for $4,000.00 or less for damages, attorneys fees and costs. In one-quarter of these cases, I settled for $2,500.00 or less for damages, fees and costs. In at least one case, I settled for costs only and in another, I waived all monetary claims so that modifications could be made to the properties. In each of these cases, the Defendants agreed to make substantial modifications to their properties to provide accessibility for people with disabilities.

9. I believe that requiring defendants to pay money is an important tool to compel compliance with access laws. If business and property owners think they can delay complying with the ADA because there are no real consequences to them, they will have no incentive to make modifications sooner rather than later. In every case, my attorney and I endeavor to obtain agreements by business and property owners to perform specific modifications by specific dates.

10. For each facility that I sued, at the time I filed each of the lawsuits, and even after the lawsuits were settled, I intended to return to the facility either to compel compliance with the ADA and/or to obtain the goods, services, benefits and privileges provided by the business.

11. Not only do I fight for barrier removal, I make an effort to ensure that

1 barriers are actually removed. I frequently monitor the status of the facilities I sue during
2 the course of litigation and I routinely re-visit facilities following settlement of my cases
3 to ensure that modifications were properly performed. If, post-settlement, I find that a
4 business has not made the modifications that it had agreed to make, I notify my attorneys,
5 including Amy B. Vandeveld. It is my understanding that Ms. Vandeveld then contacts
6 the business' or property owners' attorneys to demand that they comply with the
7 Settlement Agreements' required modifications.

  12. Most recently, about a week before the European Car Service Defendants filed their Motion to Dismiss in this case, I re-visited Sundance Market to confirm whether the modifications had been made that were required by our Settlement Agreement. I found that the modifications were inappropriate and I took photographs for my attorney, which I had printed on March 5, 2008, *two days before* the Defendants' Motion to Dismiss was filed and served. Attached hereto as Exhibit "2" are true and correct copies of the front and back of two photographs that I took at Sundance Market on my recent visit, showing the print date-stamp on the back of the photographs.

  13. To the best of my recollection, some of the facilities that I re-visited to compel ADA compliance, that still had barriers after our settlement, were: Murphy's Market, Corner Liquor, San Altos Liquor, Big K Market, Western Towing and Food Center. I was represented by Mark Potter with respect to the Food Center matter. I advised Mr. Potter that the Food Center had not complied with our Settlement Agreement and it is my understanding that he contacted the defendants' attorney in that case since accessibility modifications were later made to that store.

  14. Further, despite my re-visits to ensure compliance, at least one business continued to flout access laws and our Settlement Agreement. Murphy's Market originally did not comply with our Agreement and did not install an accessible parking space as was required. I understand that my attorney, Ms. Vandeveld, wrote a letter to the defendant's attorney and an accessible parking space was installed, as required by the

1 | Agreement. The space was located across the parking lot from the entrance, away from
2 | the building, and adjacent to the sidewalk, because the business owner wanted to be able
3 | to utilize a side door that would have been blocked if the accessible parking space were
4 | located next to the building. Two years later, in 2007, I again re-visited the facility, and
5 | the business appeared to have moved the accessible parking space next to the building,
6 | but the new space had no required access aisle. I took photographs, which I provided to
7 | my attorney and it is my understanding that she wrote another letter to the defense
8 | attorney. The current accessible parking space is now next to the building, with an access
9 | aisle. It is not in the same location as originally installed, but it is closer to the entrance
10 | and is acceptable to me. The original accessible parking space has been abandoned, the
11 | signs have been removed and the striping allowed to fade. But for my re-visits and my
12 | attorney's letters, the current space would have had no access aisle.
13 |          15.    Given the fact that Murphy's originally complied with the Settlement
14 | Agreement and then relocated the space a few years later without providing a required
15 | access aisle, I have spent the last several months again re-visiting businesses to determine
16 | if any have since failed to maintain the accessibility of their facilities. I have re-visited
17 | virtually every facility, including the out-of-town motels, to check on the modifications.
18 |          16.    With respect to my lawsuits against car repair and car sales facilities, I am a
19 | car fanatic. I love cars. In the past ten years I have owned several different cars. Most of
20 | them are older vehicles that have required regular maintenance and frequent repairs.
21 | Since becoming disabled, I have owned a 1987 Maxima, 1984 300ZX, 1977 Cadillac
22 | Seville, two 1978 Cadillac Seville (although not at the same time) and 1979 Cadillac
23 | Seville and a late 1970's Chevy Chevette. I currently own a 1997 Ford Expedition (with
24 | 248,000 miles on it) and a 1992 Mercedes station wagon. My experience, having been a
25 | longtime car owner and having been an automotive parts and sales technician, is that
26 | smaller repair shops do not charge as much as dealerships. This is why I try to visit
27 | smaller shops when looking for estimates and repairs for my vehicles. I have always
28 |

5

1 | been, and intend to continue to be, a comparison shopper. I look for the best service at
2 | the lowest cost. In fact, I visited another repair shop that specifically specializes in
3 | Mercedes Benz repairs around the time of my visit to European Car Service. The other
4 | facility had an accessible parking space, but it was blocked by repair vehicles, and I have
5 | not yet filed a lawsuit against it.
6 |     17.   I initially visited the facilities listed in Defendants' Exhibit "7" for the
7 | purpose of obtaining information about repair services and parts and to get estimates for
8 | repairs. For example, I wanted to visit MD Auto Repair to compare prices for tires and
9 | rims for my SUV. I wanted to visit JD Collision Center because my Mercedes' spoiler
10 | was cracked and needed to be repaired and I wanted to determine if they perform that sort
11 | of work. I wanted to visit Precision Motors to get prices on tune-ups and oil changes for
12 | regular maintenance on my SUV. I have already monitored these facilities, after I filed
13 | the lawsuit, and I intend to return to each of these facilities in June of 2008. While I
14 | cannot disclose the terms of my Settlement Agreement with those business owners and
15 | property owners, I am hopeful that each of these facilities will be accessible to people
16 | with disabilities in June of 2008. All of the facilities are relatively close to my home in
17 | Spring Valley and are located in a commercial area that is like an "auto shop alley",
18 | where car owners can get multiple estimates from multiple repair and auto facilities. I
19 | intend to return to these facilities to ensure that they are accessible to people with
20 | disabilities so that I have the option of utilizing their services and purchasing their goods
21 | in the future.
22 |     18.   TNT Auto Sales is an auto sales lot, which I visited in April of 2007. I am
23 | always interested in looking at, pricing and potentially purchasing other vehicles, as is
24 | evidenced by my car ownership history. I often go to automobile sales lots to see what is
25 | for sale, as well as to compare the prices of the inventory. I intend to re-visit TNT Auto
26 | Sales shortly after they complete the reconstruction of their facility and the pavement of
27 | their lot, which I understand will occur in the near future.
28 |

19. I visited the Auto Center to see if I could get an estimate for a tune-up on my Mercedes. At that time, I was actually directed by an Auto Center employee to another shop that specializes in Mercedes Benz cars. I intend to return to the Auto Center to compel compliance with the ADA. Also, my SUV receives an oil change almost every three months. I intend to re-visit the Auto Center, when it is accessible, to determine if their prices are competitive and, if so, to get an oil change.

20. I went to Import Auto Body around the same time as my visits to JD Collision, Precision Motors, MD Auto Repair and the Auto Center. As with JD Collision, I hoped to get an estimate for the repair of my Mercedes Benz spoiler. I spoke with a man of Asian descent who told me that he was not able to give me an estimate at that time. He gave me a card and requested that I call for an appointment. I could not get out of my car because there was no accessible parking space. I have not returned to the facility since my first visit because it is not accessible. I intend to return to Import Auto Body after I am advised that modifications have been made so that I can determine if the facility has, in fact, complied with the ADA. I also want to customize the fender flares on my Mercedes, so I would like to return to determine if they perform this sort of work and, if so, the cost. If the cost is reasonable, I would like to have Import Auto Body perform the work.

21. I want the same opportunities that non-disabled people have for car repairs. I want to be able to shop around, get various estimates, and have my car fixed at a reasonably priced, qualified facility. I do not have that opportunity if the car repair facility or auto sales center does not even have an accessible parking space for my use. I have returned to each of the facilities that I have sued that have not yet agreed to make accessibility modifications to monitor their status. I also intend to return to each of the facilities to compel compliance with the ADA.

22. With respect to the European Car Service business, I went to this repair shop because I wanted to have my 1992 Mercedes Benz tuned up. The car was running

1  rough and I wanted to find a reasonably priced repair shop.

2    23. I actually went to European Car Service and two other facilities looking for a tune up for my Mercedes. I went to European Car Service first to see if they could fix my car and, if so, what the cost would be. I was not able to get an estimate for repairs, so the next day, I went to the Auto Center. The Auto Center pointed me to another facility, which I later visited. I knew that a neighbor of mine worked at the other facility, but I never knew where the other facility was located. When I was directed to the other facility by the Auto Center, I was able to talk with my neighbor about getting an estimate at that other facility. The accessible space at the other facility was blocked by vehicles being repaired and I could not park my car there. Also, they were busy and I was given a card to call back to schedule an appointment. Ultimately, my Mercedes was repaired by my neighbor who performed the work at my apartment parking space.

  24. European Car Service had no accessible parking space, nor did the Auto Center. The other facility had an accessible space but it was blocked by repair vehicles. If I can park in an accessible spot, no one can park too close to me, so I can then open my car door all the way. I need to fully open my door because of my drop foot and prosthesis. Even at my apartment, I park my vehicles next to each other, and far enough away from each other, so that I can open the Mercedes' door all the way. In fact, I back my Mercedes into my parking space so that my driver's door is next to my other car. This is evident in the photos included in Defendants' Exhibit "5" to their Motion. The vehicle to the right of my Mercedes is an SUV that I also own. I back the SUV into its space so that the driver's door is adjacent to the ramp located to the right of that second space. That ramp leads to a level walkway that leads to my apartment.

  25. At European Car Service, I called out to a man who said he was the owner of the business and I told him my car was running rough. I asked if he could look at my car and give me an estimate, but he told me that he was too busy and he refused to tell me when he would have some time to look at my car. I have monitored the facility during the

course of this lawsuit and no modifications have been made as of March 5, 2008. At European Car Service, I am not able to exit my vehicle or get into the office because of the absence of an accessible parking space and a ramp.

26. When I filed my lawsuit against European Car Service, and even today, I intended to return to the repair shop. First, I want to compel European Car Service to remove architectural barriers, as required by the ADA. I want to be able to park my car in an accessible spot and walk or roll into the office, like other non-disabled people. Since my Mercedes is about 16 years old, it requires regular maintenance. I want to be able to take it to low-cost repair shops that specialize in Mercedes vehicles. Ultimately I may learn that European's repair costs are quite reasonable or I may learn that they are outside of my budget, but I will never have that opportunity if I cannot even get out of my car at the repair shop.

27. I am committed to making my world more accessible for me and for others with disabilities. Not only do I file lawsuits when I find facilities are not accessible, but I also follow up to ensure that barriers are removed. I have spent my own money on gas and photographs re-visiting businesses after lawsuits were settled simply because accessibility is important to me.

28. Attached hereto as Exhibit "3" are photographs of the parking lot and walkway at European Car Service. These photos accurately depict the conditions that I observed on July 10, 2007 during my first visit and on March 5, 2008 when I drove past the facility to monitor its status. There was no ramp at the walkway and there were no accessible parking spaces in the lot during either of my visits to the property.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 3-31 day of March, 2008 at San Diego, California.

*/s/ Karel Spikes*
KAREL SPIKES

9