Lawrence Mudgett SBN 252898
Athanasios Preovolos 182334
PREOVOLOS & ASSOCIATES, ALC
401 B Street, Suite 1520
San Diego, CA 92101
TEL: (619)696-0520
FAX: (619)238-5344

Attorney for Defendants
European Car Service and Zenon Smocyznski

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREL SPIKES<br><br>             Plaintiff<br><br>     v.<br><br>EUROPEAN CAR SERVICE; ZENON SMOCZYNSKI; ANDREW MACIEJEWSKI; and DOES 1 through 10, inclusive,<br><br>             Defendants. | Case No.: 07CV2394LABWMC<br><br>**REPLY TO PLAINTIFFS OPPOSITION TO DEFENDANTS MOTION TO DISMISS PURSUANT TO 12(B)(1)**<br><br><br>Date:  April 14, 2008<br>Judge: The Honorable Larry A. Burns |

Defendants, ZENON SMOCZYNSKI and EUROPEAN CAR SERVICE, hereby submits

the following Reply to Plaintiffs Opposition to Defendant's Motion to Dismiss for Lack of

Standing and opposes Plaintiff's request for Summary Judgment in their favor.  Plaintiff's

Motion to Dismiss is based upon this Reply as well as the Motion to Dismiss previously

submitted.

REPLY TO PLAINTIFFS OPPOSITION                    07CV2394LABWMC

1

**I.**

## DEFENDANTS MOTION IS A FACIAL ATTACK AGAINST PLAINTIFF'S COMPLAINT AND A MOTION TO DISMISS IS APPROPRIATE

The underlying facts regarding the interaction between Plaintiff and Defendant on or about July 10, 2007 are not in dispute.  In his declaration Plaintiff Spikes states,

> At European Car Service, I called out a man who said he was the owner of the business and I told him my car was running rough.  I asked if he could look at my car and give me an estimate, but he told me that he was too busy and refused to tell me when he would have some time to look at my car.  (See Declaration of Karel Spikes Page 8, Section 25, lines 24-28).

Defendant Zenon Smoczynski describes the interaction as:

9)   I have neither contracted with nor been paid by Karel Spikes.
10)   I have never provided Karel Spikes a written estimate.
11)   I was the only mechanic present at the property on July 10, 2007 and an individual that I now know to be Karel Spikes drove onto the property in a white Mercedes.
12)   He rolled down his window and asked me for a quote to service his car.  I cannot recall what he requested to have repaired.
13)   I do not give anyone verbal quotes and refused to quote him a price
14)   Spikes then left European Car Service
15)   I have not seen Karel Spikes or his white Mercedes ever since. (See declaration of Zenon Smoczynski, Pages 1-2, lines 27-9)

The two men provide a nearly identical description of the same event.  The material facts surrounding the alleged incident itself are not in dispute while the two parties disagree about their respective motives for the interaction.  On the one hand, the Plaintiff contends that he was "shopping around" for repair quotes in order to have his "car tuned up" and that he "was unable to exit his vehicle" because of the alleged violations. (See Generally Declaration of Karel Spikes).  Contrarily, the Defendant contends that the Plaintiff had no intention of having his car "tuned up" by the Defendant and was attempting to falsely manufacture standing to sue for the alleged ADA violations in order to extort a cash settlement.

Regardless of which parties explanation the court and/or jury were inclined to believe, the undisputed facts as alleged by either party do not establish standing to sue the Defendant under the American with Disabilities Act.  Defendant's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction based upon Plaintiff's lack of standing is therefore appropriate. (See also Defendant's Motion to Dismiss, Page 6-7, Section 2(b), lines 19 – 15) Therefore, Defendant respectfully requests that the motion to dismiss be granted.

## II.

### THE PLAINTIFF DOES NOT HAVE STANDING TO SUE THE DEFENDANT BASED UPON THE UNDISPUTED FACTS ALLEGED

In a factually similar ADA complaint, the Southern District federal court dismissed the Plaintiff's complaint for lack of subject matter jurisdiction.  Wilson v Kayo Oil Company, 2007 U.S. Dist. Lexis 79832 (S.D. Cal. Oct 25, 2007).  In determining the standing question the court required that the Plaintiff show 1) an injury in fact; 2) traceable to the challenged action of the defendant; and 3) likely to be redressed by a favorable decision.  Id at *4.  The Wilson court's analysis was limited to the "injury in fact" element and applied a four-factor standing analysis to determine if an injury in fact had occurred.  Id at *4.

The four-factor standing test applied in this jurisdiction to an identical case consisted of: 1) the proximity of the place of public accommodation to the plaintiff's residence; 2) the plaintiff's past patronage of defendant's business; 3) the definitiveness of plaintiff's plans to return; and 4) the plaintiff's frequency of travel near the accommodation in question.  Id at *4. Moreover the proximity issue is irrelevant when adjudicating the defendant's motion to dismiss. Id at *4.

In this case: 1) the plaintiff has no past patronage to the Defendant's business, 2) cannot demonstrate plans to return to Defendant's business, and 3) has not alleged frequent travel to Defendant's business (See Declaration of Karel Spikes). Accordingly, the Defendant requests that Plaintiffs complaint be dismissed for lack of standing.

### III.

### LIBERAL CONSTRUCTION AND TESTERS

Liberal Construction Does Not Include Hypothetical Injuries

Plaintiff has alleged that standing is to be liberally construed in civil rights cases and ignores the four-factor standing test described above claiming that Spikes suffered an injury in fact the moment he became aware of the architectural barriers at European Car Service which allegedly deterred his patronage.

Assuming arguendo, that Plaintiff's version of the "injury in fact" analysis were correct, then Plaintiff has failed to show how Spikes' patronage of European Car Service was deterred by the alleged "architectural barriers." Spikes claims to have beckoned Smoczynski over to his car and complained to him that his car was "running rough." (See Declaration of Karel Spikes). Smoczynski then told Spikes that he was too busy to work on his car and Spikes left without incident. (See Declaration of Karel Spikes). Spikes has not alleged to have returned since and Smoczynski has not seen him at European Car Service since July 10, 2007 (See Declaration of Zenon Smoczynski).

Therefore, the fact that the Defendant was busy repairing his client's European automobiles precluded him from servicing the Plaintiff's automobile and not the architectural barriers as alleged. Had the Plaintiff exited his vehicle it would not have changed the fact that the Defendant was unable to work on his automobile at that time. Moreover, the Plaintiff never

obtained a written estimate, was not given a verbal quote, no work was ever done on his car, and he never returned to European Car Service.

Therefore, Plaintiff has failed to allege facts sufficient to find standing even under the proposed "liberal analysis." At best, the Defendant's busy schedule inconvenienced the Plaintiff by requiring that he visit another auto repair shop to have his car "tuned up." The Plaintiff was then able to have his neighbor "tune up" his car for him. This is hardly the type of "discrimination" the American with Disabilities Act is intended to redress. Defendant requests that this court apply the four-factor analysis as described above and dismiss Plaintiff's complaint for lack of standing.

Title III of the ADA Does Not Allow Testers

Plaintiff has alleged that: 1) because Title II of the ADA allows "testers" and 2) all titles of the ADA are intended to prevent discrimination; therefore, Title III actions should similarly allow "testers" as well. Had the legislature intended for the use of "testers" in Title III actions then they would have said so in the plain language of Title III. However, the legislature did not and the Defendant respectfully requests that this court not adopt such an extreme view.

Plaintiff is correct that Title III creates legal rights for "any person" with a disability. However, these rights are created for "any person" with a disability who also "suffers discrimination" at a place of public accomodation (Title III, American with Disabilities Act). The undisputed facts show that Spikes has not suffered an injury in fact and likewise has not been discriminated against by the Defedant. Moreover, Plaintiff has failed to cite a single case in support of the theory that "testers" are allowed in Title III actions. The Defendant respectfully requests that this court not grant Plaintiff's rights tantamount to a "private attorney general" without any legal support for their unorthodox position.

IV.

## TITLE III STANDING IS LIMITED TO CUSTOMERS, CLIENTS, AND/OR LEGITIMATE FUTURE CUSTOMERS AND CLIENTS IN THIS CASE

In a factually dissimilar ADA case the court held that the ADA Plaintiff need not have been a customer or client of the Defendant's restaurant to feel the sting of discrimination. Molski v M.J. Cable Inc, 481 F. 3d 724 (9th Cir. 2007). Interestingly enough, the Plaintiff in that case was a customer of the defendant's restaurant. Molski v M.J. Cable Inc, 481 F. 3d 724 (9th Cir. 2007).

In any event, the fact that the Plaintiff in this case was never a client or customer of Defendant's is *a* factor in determining whether or not he suffered an injury in fact under the Wilson test but is not *the* determining factor. Arguably, the facts that the Plaintiff never obtained a verbal quote, written estimate, or had repair work done by Defendant MAY not be enough to support Defendant's motion under the Molski standard without something more.

In this case, 1) the Plaintiff has also never returned to the Defendant's business, 2) has sued seven (7) auto repair facilities since December 2007, 3) is a serial litigant and has sued 149 establishments in this District since 2000, 4) is seeking a cash settlement when the ADA only entitles him to injunctive relief, 5) had the alleged repair work performed by "his neighbor" and has offered no corroborating proof 6) never bothered to call the Defendant, 7) has not specified what was wrong with his car, 8) sued for damages before requesting that Defendant repair the premises, and 9) *admits to traveling to another auto repair facility specifically because the Defendant was too busy to work on his car.* (See Declaration of Karel Spikes)

These facts, and others as discussed in Defendants Motion to Dismiss, show that the Plaintiff has NOT suffered an injury in fact under the four-factor standing analysis as described

in the <u>Wilson</u> case above.  At best, they show he was inconvenienced by the Defendant's busy

scheduled.

Moreover, there is no history of past patronage, no attempted past patronage, and the

Defendant cannot reasonably claim that he intends to have his automobile fixed at the

Defendant's facility after suing six (6) other auto repair facilities since suing the Defendant for

the same violation.  Most importantly, the Plaintiff admits to leaving the Defendant's facility

after he stated that he was "too busy" to work on his car and Plaintiff went to another car care

facility for a "tune up."  Plaintiff was not precluded from obtaining defendants services based

upon architectural barriers, he was precluded by Defendant's busy schedule on July 10, 2007.

Plaintiff went to another facility, has not since returned to Defendant's shop, and had his

neighbor perform the tune up.   There is no reasonable basis to conclude that the Plaintiff has

suffered an injury in fact.   Therefore, Plaintiff's complaint must be dismissed for lack of

standing as it is facially inadequate under the circumstances.

## CONCLUSION

Defendant has been soliciting bids for blue-striping the area designated for the van

accessible handicapped parking space, installing a "built up curb ramp," and smoothing the

access aisle to the curb ramp pursuant to both Plaintiff's request and the CALDAG requirements

provided by Plaintiff.  Nevertheless, Plaintiff is not satisfied with the Defendant's repair attempts

and insists on proceeding with litigation in order to recover monetary damages for the alleged

violations.  Plaintiff supports their position with numerous exhibits and declarations of unrelated

and irrelevant letters that Plaintiff has drafted to Defendant's in other cases regarding the

necessity of monetary damages to ensure compliance with the ADA's requirements.

REPLY TO PLAINTIFFS OPPOSITION                                07CV2394LABWMC

Be that as it may, Plaintiff's admits to visiting the premises and then leaving because the Defendant was "too busy" to repair his car.  At best, Plaintiff was inconvenienced by the Defendant's busy schedule and was not denied access to anything based upon the alleged architectural barriers.

WHERETOFORE, the Defendant requests that:

1) The 12(b)(1) motion to dismiss be granted,

2) The Plaintiff's request for summary judgment be denied,

3) That the Defendant be reimbursed for his attorneys fees and costs in an amount according to proof, and

4) That Plaintiff Karel Spikes be classified as a vexatious litigant.

Respectfully Submitted,

April 8, 2008

Lawrence A. Mudgett III
Attorney for Defendants
EUROPEAN CAR SERVICE and
ZENON SMOCZYNSKI

Lawrence Mudgett, SBN 252898
Preovolos & Associates, ALC
401 B Street, Suite 1520
San Diego, CA 92101
(619) 696-0520
(619) 238-5344 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was this date served upon all counsel of record by placing a copy of the same in the United States Mail, postage prepaid, and sent to their last known address as follows:

Ms. Amy Vandeveld
Law Offices of Amy B. Vandeveld
1850 Fifth Avenue, Suite 22
San Diego, CA 92101

San Diego, CA this Eighth day of April, 2008

Lawrence Mudgett III
Attorney for Defendant EUROPEAN CAR
SERVICE and ZENON SMOCZYNSKI

PROOF OF SERVICE

1

1  Amy B. Vandeveld, SBN 137904
   LAW OFFICES OF AMY B. VANDEVELD
2  1850 Fifth Avenue, Suite 22
   San Diego, CA   92101
3  Telephone: (619) 231-8883
   Facsimile: (619) 231-8329
4
   Attorney for KAREL SPIKES
5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10 KAREL SPIKES,                          Case No.: 07 CV 2394 LAB
                                          (WMc)
11              Plaintiff,
                                          **DECLARATION OF KAREL**
12 vs.                                    **SPIKES IN SUPPORT OF**
                                          **PLAINTIFF'S OPPOSITION**
13 EUROPEAN CAR SERVICE; ANDREW           **TO DEFENDANTS' MOTION**
   MACIEJEWSKI; ZENNON SMOCYNSKI and      **TO DISMISS**
14 DOES 1 THROUGH 10, Inclusive,
                                          **[FRCP 12(B)(1)]**
15              Defendants.
                                          Date:  April 14, 2008
16                                        Time:  11:15 a.m.
                                          Courtroom: 9
17                                        Judge: The Honorable Larry A.
                                                 Burns
18
   ─────────────────────────────────────
19

20      I, KAREL SPIKES, declare:

21      1.      I am the Plaintiff in the instant action.   I am a resident of the County of San

22 Diego, State of California and I have personal knowledge of the following facts.  If called

23 as a witness, I could and would competently testify to the following:

24      2.      I have at least three conditions which substantially impair my ability to

25 walk, stand, climb stairs and negotiate curbs: a) traumatic above-knee amputation of the

26 right lower extremity; b) chronic instability of the left knee due to knee dislocation; and c)

27 drop-foot due to permanent neurological injury at the left knee.

28      3.      I was prescribed a wheelchair because I cannot walk without great difficulty

1  and pain, nor can I stand for more than fifteen to twenty minutes without great difficulty
2  and pain.
3          4.      While I can walk, if wearing a prosthesis, my gait is severely imbalanced
4  and unsteady, due to my disabilities. These conditions also severely limit the distance I
5  am able to walk. Further, my disabilities make it difficult, if not impossible, for me to
6  negotiate curbs and/or stairs unless there are railings or other supportive features
7  available.
8          5.      I suffer from "phantom pains" associated with my amputated extremity. I
9  have been treated for debilitating phantom pains.
10         6.      I sued a number of businesses and property owners in the San Diego County
11 area, along with a few places outside of the San Diego County area, because of
12 architectural barriers that prevent people with mobility impairments, including myself,
13 from obtaining full and equal access to these places of public accommodation.
14         7.      All of my cases that have resolved thus far, were resolved by way of
15 settlement. Before I will settle a case, I require the business and property owners to
16 remove architectural barriers. Attached hereto collectively as Exhibit "1" are copies of
17 pertinent pages of three non-confidential Settlement Agreements, which illustrate the
18 modifications I typically require of Defendants. There have been only a few instances in
19 which modifications were not presently required under the Settlement Agreement because
20 the business was no longer operational or the business was going to cease operations in
21 the near future. In those cases, I typically required that the business and property owners
22 agree to remove architectural barriers before the re-opening of the business, if that
23 occurred, or before another business opened for business at the particular site. For
24 example, I was advised during my lawsuit that Steve's Cabana Bar would likely close
25 after I filed my lawsuit. We still agreed, in the Settlement Agreement, that if the business
26 re-opened at the property, it would remove architectural barriers before re-opening.
27 During the lawsuit against 99 Cent Variety Store on University Avenue, the Defendant
28

represented that it intended to cease doing business in the near future. In our Settlement Agreement, the Defendant agreed to make repairs to the interior of the facility if it continued to operate at the property.

8.      While I typically seek damages, fees and costs in my cases, I have never settled a case for just money. In fact, in several cases I have waived my claims for damages, fees and costs, or I have agreed to greatly reduced amounts for damages, fees and costs so that the business owner could make our required modifications to their facilities. Most of the Settlement Agreements I have entered into are confidential with respect to the amount of money paid to me because, it is my understanding, this is a term of settlement required by most defendants. Generally, however, I have settled almost one-quarter of my cases for $4,000.00 or less for damages, attorneys fees and costs. In one-quarter of these cases, I settled for $2,500.00 or less for damages, fees and costs. In at least one case, I settled for costs only and in another, I waived all monetary claims so that modifications could be made to the properties. In each of these cases, the Defendants agreed to make substantial modifications to their properties to provide accessibility for people with disabilities.

9.      I believe that requiring defendants to pay money is an important tool to compel compliance with access laws. If business and property owners think they can delay complying with the ADA because there are no real consequences to them, they will have no incentive to make modifications sooner rather than later. In every case, my attorney and I endeavor to obtain agreements by business and property owners to perform specific modifications by specific dates.

10.     For each facility that I sued, at the time I filed each of the lawsuits, and even after the lawsuits were settled, I intended to return to the facility either to compel compliance with the ADA and/or to obtain the goods, services, benefits and privileges provided by the business.

11.     Not only do I fight for barrier removal, I make an effort to ensure that

3

1  barriers are actually removed. I frequently monitor the status of the facilities I sue during

2  the course of litigation and I routinely re-visit facilities following settlement of my cases

3  to ensure that modifications were properly performed. If, post-settlement, I find that a

4  business has not made the modifications that it had agreed to make, I notify my attorneys,

5  including Amy B. Vandeveld. It is my understanding that Ms. Vandeveld then contacts

6  the business' or property owners' attorneys to demand that they comply with the

7  Settlement Agreements' required modifications.

8         12.    Most recently, about a week before the European Car Service Defendants

9  filed their Motion to Dismiss in this case, I re-visited Sundance Market to confirm

10  whether the modifications had been made that were required by our Settlement

11  Agreement. I found that the modifications were inappropriate and I took photographs for

12  my attorney, which I had printed on March 5, 2008, *two days before* the Defendants'

13  Motion to Dismiss was filed and served. Attached hereto as Exhibit "2" are true and

14  correct copies of the front and back of two photographs that I took at Sundance Market on

15  my recent visit, showing the print date-stamp on the back of the photographs.

16         13.    To the best of my recollection, some of the facilities that I re-visited to

17  compel ADA compliance, that still had barriers after our settlement, were: Murphy's

18  Market, Corner Liquor, San Altos Liquor, Big K Market, Western Towing and Food

19  Center. I was represented by Mark Potter with respect to the Food Center matter. I

20  advised Mr. Potter that the Food Center had not complied with our Settlement Agreement

21  and it is my understanding that he contacted the defendants' attorney in that case since

22  accessibility modifications were later made to that store.

23         14.    Further, despite my re-visits to ensure compliance, at least one business

24  continued to flout access laws and our Settlement Agreement. Murphy's Market

25  originally did not comply with our Agreement and did not install an accessible parking

26  space as was required. I understand that my attorney, Ms. Vandeveld, wrote a letter to

27  the defendant's attorney and an accessible parking space was installed, as required by the

28

4

1  Agreement.  The space was located across the parking lot from the entrance, away from
2  the building, and adjacent to the sidewalk, because the business owner wanted to be able
3  to utilize a side door that would have been blocked if the accessible parking space were
4  located next to the building.  Two years later, in 2007, I again re-visited the facility, and
5  the business appeared to have moved the accessible parking space next to the building,
6  but the new space had no required access aisle.  I took photographs, which I provided to
7  my attorney and it is my understanding that she wrote another letter to the defense
8  attorney.  The current accessible parking space is now next to the building, with an access
9  aisle.  It is not in the same location as originally installed, but it is closer to the entrance
10  and is acceptable to me.  The original accessible parking space has been abandoned, the
11  signs have been removed and the striping allowed to fade.  But for my re-visits and my
12  attorney's letters, the current space would have had no access aisle.

13         15.    Given the fact that Murphy's originally complied with the Settlement
14  Agreement and then relocated the space a few years later without providing a required
15  access aisle, I have spent the last several months again re-visiting businesses to determine
16  if any have since failed to maintain the accessibility of their facilities.   I have re-visited
17  virtually every facility, including the out-of-town motels, to check on the modifications.

18         16.    With respect to my lawsuits against car repair and car sales facilities, I am a
19  car fanatic.  I love cars.  In the past ten years I have owned several different cars.  Most of
20  them are older vehicles that have required regular maintenance and frequent repairs.
21  Since becoming disabled, I have owned a 1987 Maxima, 1984 300ZX, 1977 Cadillac
22  Seville, two 1978 Cadillac Seville (although not at the same time) and 1979 Cadillac
23  Seville and a late 1970's Chevy Chevette.  I currently own a 1997 Ford Expedition (with
24  248,000 miles on it) and a 1992 Mercedes station wagon.  My experience, having been a
25  longtime car owner and having been an automotive parts and sales technician, is that
26  smaller repair shops do not charge as much as dealerships.  This is why I try to visit
27  smaller shops when looking for estimates and repairs for my vehicles.  I have always

28

been, and intend to continue to be, a comparison shopper. I look for the best service at
the lowest cost. In fact, I visited another repair shop that specifically specializes in
Mercedes Benz repairs around the time of my visit to European Car Service. The other
facility had an accessible parking space, but it was blocked by repair vehicles, and I have
not yet filed a lawsuit against it.

17.     I initially visited the facilities listed in Defendants' Exhibit "7" for the
purpose of obtaining information about repair services and parts and to get estimates for
repairs. For example, I wanted to visit MD Auto Repair to compare prices for tires and
rims for my SUV. I wanted to visit JD Collision Center because my Mercedes' spoiler
was cracked and needed to be repaired and I wanted to determine if they perform that sort
of work. I wanted to visit Precision Motors to get prices on tune-ups and oil changes for
regular maintenance on my SUV. I have already monitored these facilities, after I filed
the lawsuit, and I intend to return to each of these facilities in June of 2008. While I
cannot disclose the terms of my Settlement Agreement with those business owners and
property owners, I am hopeful that each of these facilities will be accessible to people
with disabilities in June of 2008. All of the facilities are relatively close to my home in
Spring Valley and are located in a commercial area that is like an "auto shop alley",
where car owners can get multiple estimates from multiple repair and auto facilities. I
intend to return to these facilities to ensure that they are accessible to people with
disabilities so that I have the option of utilizing their services and purchasing their goods
in the future.

18.     TNT Auto Sales is an auto sales lot, which I visited in April of 2007. I am
always interested in looking at, pricing and potentially purchasing other vehicles, as is
evidenced by my car ownership history. I often go to automobile sales lots to see what is
for sale, as well as to compare the prices of the inventory. I intend to re-visit TNT Auto
Sales shortly after they complete the reconstruction of their facility and the pavement of
their lot, which I understand will occur in the near future.

19.    I visited the Auto Center to see if I could get an estimate for a tune-up on my Mercedes.  At that time, I was actually directed by an Auto Center employee to another shop that specializes in Mercedes Benz cars.  I intend to return to the Auto Center to compel compliance with the ADA.  Also, my SUV receives an oil change almost every three months.  I intend to re-visit the Auto Center, when it is accessible, to determine if their prices are competitive and, if so, to get an oil change.

20.    I went to Import Auto Body around the same time as my visits to JD Collision, Precision Motors, MD Auto Repair and the Auto Center.  As with JD Collision, I hoped to get an estimate for the repair of my Mercedes Benz spoiler.  I spoke with a man of Asian descent who told me that he was not able to give me an estimate at that time.  He gave me a card and requested that I call for an appointment.  I could not get out of my car because there was no accessible parking space.  I have not returned to the facility since my first visit because it is not accessible.  I intend to return to Import Auto Body after I am advised that modifications have been made so that I can determine if the facility has, in fact, complied with the ADA.  I also want to customize the fender flares on my Mercedes, so I would like to return to determine if they perform this sort of work and, if so, the cost.  If the cost is reasonable, I would like to have Import Auto Body perform the work.

21.    I want the same opportunities that non-disabled people have for car repairs. I want to be able to shop around, get various estimates, and have my car fixed at a reasonably priced, qualified facility.  I do not have that opportunity if the car repair facility or auto sales center does not even have an accessible parking space for my use.  I have returned to each of the facilities that I have sued that have not yet agreed to make accessibility modifications to monitor their status.  I also intend to return to each of the facilities to compel compliance with the ADA.

22.    With respect to the European Car Service business, I went to this repair shop because I wanted to have my 1992 Mercedes Benz tuned up.  The car was running

7

1  rough and I wanted to find a reasonably priced repair shop.

2      23.    I actually went to European Car Service and two other facilities looking for

3  a tune up for my Mercedes. I went to European Car Service first to see if they could fix

4  my car and, if so, what the cost would be. I was not able to get an estimate for repairs, so

5  the next day, I went to the Auto Center. The Auto Center pointed me to another facility,

6  which I later visited. I knew that a neighbor of mine worked at the other facility, but I

7  never knew where the other facility was located. When I was directed to the other facility

8  by the Auto Center, I was able to talk with my neighbor about getting an estimate at that

9  other facility. The accessible space at the other facility was blocked by vehicles being

10  repaired and I could not park my car there. Also, they were busy and I was given a card

11  to call back to schedule an appointment. Ultimately, my Mercedes was repaired by my

12  neighbor who performed the work at my apartment parking space.

13      24.    European Car Service had no accessible parking space, nor did the Auto

14  Center. The other facility had an accessible space but it was blocked by repair vehicles.

15  If I can park in an accessible spot, no one can park too close to me, so I can then open my

16  car door all the way. I need to fully open my door because of my drop foot and

17  prosthesis. Even at my apartment, I park my vehicles next to each other, and far enough

18  away from each other, so that I can open the Mercedes' door all the way. In fact, I back

19  my Mercedes into my parking space so that my driver's door is next to my other car. This

20  is evident in the photos included in Defendants' Exhibit "5" to their Motion. The vehicle

21  to the right of my Mercedes is an SUV that I also own. I back the SUV into its space so

22  that the driver's door is adjacent to the ramp located to the right of that second space.

23  That ramp leads to a level walkway that leads to my apartment.

24      25.    At European Car Service, I called out to a man who said he was the owner

25  of the business and I told him my car was running rough. I asked if he could look at my

26  car and give me an estimate, but he told me that he was too busy and he refused to tell me

27  when he would have some time to look at my car. I have monitored the facility during the

28

8

1  course of this lawsuit and no modifications have been made as of March 5, 2008.  At

2  European Car Service, I am not able to exit my vehicle or get into the office because of

3  the absence of an accessible parking space and a ramp.

4      26.    When I filed my lawsuit against European Car Service, and even today, I

5  intended to return to the repair shop.  First, I want to compel European Car Service to

6  remove architectural barriers, as required by the ADA.  I want to be able to park my car in

7  an accessible spot and walk or roll into the office, like other non-disabled people.  Since

8  my Mercedes is about 16 years old, it requires regular maintenance.  I want to be able to

9  take it to low-cost repair shops that specialize in Mercedes vehicles.  Ultimately I may

10  learn that European's repair costs are quite reasonable or I may learn that they are outside

11  of my budget, but I will never have that opportunity if I cannot even get out of my car at

12  the repair shop.

13      27.    I am committed to making my world more accessible for me and for others

14  with disabilities.  Not only do I file lawsuits when I find facilities are not accessible, but I

15  also follow up to ensure that barriers are removed.  I have spent my own money on gas

16  and photographs re-visiting businesses after lawsuits were settled simply because

17  accessibility is important to me.

18      28.    Attached hereto as Exhibit "3" are photographs of the parking lot and

19  walkway at European Car Service.  These photos accurately depict the conditions that I

20  observed on July 10, 2007 during my first visit and on March 5, 2008 when I drove past

21  the facility to monitor its status.  There was no ramp at the walkway and there were no

22  accessible parking spaces in the lot during either of my visits to the property.

23      I declare under penalty of perjury under the laws of the State of California and the

24  United States of America that the foregoing is true and correct.

25      Executed this 3-31 day of March, 2008 at San Diego, California.

26

27  _____
   KAREL SPIKES

28

9

Lawrence Mudgett SBN 252898
Athanasios Preovolos SBN 182334
Preovolos & Associates, a Law Corporation
401 B Street, Suite 1520
San Diego, CA 92101
Telephone: 619-696-0520
Facsimile: 619-238-5344


Attorney for Defendants
Zenon Smoczynski and European Car Service

## DECLARATION OF ZENON SMOCZYNSKI

I am ZENON SMOCZYNSKI, I have independent personal knowledge of the facts attested herein and declare them to be true and correct under penalty of perjury. If called upon to do so I could and would testify to the same.

1)    I am the sole owner and operator of European Car Service, I am the only mechanic, I have no employees, and have been in business since on or about 1992.

2)    European Car Service is located at 8855 La Mesa Blvd in La Mesa, California (hereinafter "the property") and I co-own the property with Andrew Maciejewski.

3)    I specialize in repairing European automobiles, I have no retail inventory, and my clients do not frequently visit the property.

4)    The property consists of an office, mechanics garage, surrounding area, and a vacant lot.

5)    My clients either contact me, their vehicles are towed to me, or they are referred to me. I do not obtain clients by any other means.

6)    I do not service my client's European cars unless I am contracted to do so first.

7)    My clients contract for services and then pay me upon completion.

8)    Oftentimes, individuals first contact me seeking a written estimate for my services.

9)    I have neither contracted with nor been paid by Karel Spikes.

10) I have never provided Karel Spikes a written estimate.

11) I was the only mechanic present at the property on July 10, 2007 and an individual that I now know to be Karel Spikes drove onto the property in a white Mercedes.

12) Karel Spikes did not exit his vehicle.

13) He rolled down his window and asked me for a quote to service his car. I cannot recall what he requested to have repaired.

14) I do not give anyone verbal quotes and refused to quote him a price.

15) Spikes then left European Car Service.

16) I have not seen Karel Spikes or his white Mercedes ever since.

17) I was not aware of his handicap as he did not exit his vehicle.

18) The entire incident lasted approximately one minute.

19) On or about March 5, 2008 my attorney Lawrence Mudgett showed me a photograph of Karel Spikes and a Mercedes model 300TE station wagon with disabled license plate number Y0628.

20) This was the first time I had seen Karel Spikes or that Mercedes wagon since July 10, 2007.

21) I had no basis to conclude the individual in the photograph was Karel Spikes or that the Mercedes wagon belonged to him but for my attorney's representations.

22) Upon seeing the photograph I was able to recall the incident described in sections 11- 18 above.

23) I was surprised that the individual in the incident above is the same man who is suing me now since I never worked on his car, prepared a quote, or was even aware of his handicap.

24) I have not serviced any Mercedes model 300TE wagons since the year 2000 and to the best of my knowledge, I cannot recall ever servicing any Mercedes model 300TE wagon at any time.

25) On January 15, 2008 I was the only employee present at European Car Service.

26)    I was personally served with two copies of Plaintiff's complaint, one on behalf of myself and one on behalf of European Car Service.

27)    Andrew Maciejewski was not present at European Car Service on January 15, 2008 and could not have been personally served there.

28)    Andrew left San Diego on or about June 2001 and I have not seen him since.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: March 7, 2008

*Zenon Smoczynski*

Zenon Smoczynski