**Exhibit 1**

1  Amy B. Vandeveld, SBN 137904
   LAW OFFICES OF AMY B. VANDEVELD
2  1850 Fifth Avenue, Suite 22
   San Diego, CA  92101
3  Telephone: (619) 231-8883
   Facsimile: (619) 231-8329
4
   Attorney for KAREL SPIKES
5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10 KAREL SPIKES,                          Case No.: 07 CV 2394 LAB
                                          (WMc)
11            Plaintiff,
                                          DECLARATION OF KAREL
12 vs.                                    SPIKES IN SUPPORT OF
                                          PLAINTIFF'S OPPOSITION
13 EUROPEAN CAR SERVICE; ANDREW           TO DEFENDANTS' MOTION
   MACIEJEWSKI; ZENNON SMOCYNSKI and      TO DISMISS
14 DOES 1 THROUGH 10, Inclusive,
                                          [FRCP 12(B)(1)]
15            Defendants.

16

17                                        Date:  April 14, 2008
                                          Time:  11:15 a.m.
18                                        Courtroom: 9
                                          Judge: The Honorable Larry A.
19                                            Burns

20        I, KAREL SPIKES, declare:

21        1.     I am the Plaintiff in the instant action.  I am a resident of the County of San

22 Diego, State of California and I have personal knowledge of the following facts.  If called

23 as a witness, I could and would competently testify to the following:

24        2.     I have at least three conditions which substantially impair my ability to

25 walk, stand, climb stairs and negotiate curbs: a) traumatic above-knee amputation of the

26 right lower extremity; b) chronic instability of the left knee due to knee dislocation; and c)

27 drop-foot due to permanent neurological injury at the left knee.

28        3.     I was prescribed a wheelchair because I cannot walk without great difficulty

Case 3:07-cv-02394-LAB-WMC     Document 14-6     Filed 04/01/2008     Page 2 of 18

1   and pain, nor can I stand for more than fifteen to twenty minutes without great difficulty

2   and pain.

3       4.      While I can walk, if wearing a prosthesis, my gait is severely imbalanced

4   and unsteady, due to my disabilities. These conditions also severely limit the distance I

5   am able to walk. Further, my disabilities make it difficult, if not impossible, for me to

6   negotiate curbs and/or stairs unless there are railings or other supportive features

7   available.

8       5.      I suffer from "phantom pains" associated with my amputated extremity. I

9   have been treated for debilitating phantom pains.

10      6.      I sued a number of businesses and property owners in the San Diego County

11  area, along with a few places outside of the San Diego County area, because of

12  architectural barriers that prevent people with mobility impairments, including myself,

13  from obtaining full and equal access to these places of public accommodation.

14      7.      All of my cases that have resolved thus far, were resolved by way of

15  settlement. Before I will settle a case, I require the business and property owners to

16  remove architectural barriers. Attached hereto collectively as Exhibit "1" are copies of

17  pertinent pages of three non-confidential Settlement Agreements, which illustrate the

18  modifications I typically require of Defendants. There have been only a few instances in

19  which modifications were not presently required under the Settlement Agreement because

20  the business was no longer operational or the business was going to cease operations in

21  the near future. In those cases, I typically required that the business and property owners

22  agree to remove architectural barriers before the re-opening of the business, if that

23  occurred, or before another business opened for business at the particular site. For

24  example, I was advised during my lawsuit that Steve's Cabana Bar would likely close

25  after I filed my lawsuit. We still agreed, in the Settlement Agreement, that if the business

26  re-opened at the property, it would remove architectural barriers before re-opening.

27  During the lawsuit against 99 Cent Variety Store on University Avenue, the Defendant

28

Case 3:07-cv-02394-LAB-WMC    Document 14-6    Filed 04/01/2008    Page 3 of 18

1  represented that it intended to cease doing business in the near future. In our Settlement

2  Agreement, the Defendant agreed to make repairs to the interior of the facility if it

3  continued to operate at the property.

4         8.      While I typically seek damages, fees and costs in my cases, I have never

5  settled a case for just money. In fact, in several cases I have waived my claims for

6  damages, fees and costs, or I have agreed to greatly reduced amounts for damages, fees

7  and costs so that the business owner could make our required modifications to their

8  facilities. Most of the Settlement Agreements I have entered into are confidential with

9  respect to the amount of money paid to me because, it is my understanding, this is a term

10 of settlement required by most defendants. Generally, however, I have settled almost

11 one-quarter of my cases for $4,000.00 or less for damages, attorneys fees and costs. In

12 one-quarter of these cases, I settled for $2,500.00 or less for damages, fees and costs. In

13 at least one case, I settled for costs only and in another, I waived all monetary claims so

14 that modifications could be made to the properties. In each of these cases, the Defendants

15 agreed to make substantial modifications to their properties to provide accessibility for

16 people with disabilities.

17        9.      I believe that requiring defendants to pay money is an important tool to

18 compel compliance with access laws. If business and property owners think they can

19 delay complying with the ADA because there are no real consequences to them, they will

20 have no incentive to make modifications sooner rather than later. In every case, my

21 attorney and I endeavor to obtain agreements by business and property owners to perform

22 specific modifications by specific dates.

23        10.     For each facility that I sued, at the time I filed each of the lawsuits, and

24 even after the lawsuits were settled, I intended to return to the facility either to compel

25 compliance with the ADA and/or to obtain the goods, services, benefits and privileges

26 provided by the business.

27        11.     Not only do I fight for barrier removal, I make an effort to ensure that

28

1  barriers are actually removed. I frequently monitor the status of the facilities I sue during
2  the course of litigation and I routinely re-visit facilities following settlement of my cases
3  to ensure that modifications were properly performed. If, post-settlement, I find that a
4  business has not made the modifications that it had agreed to make, I notify my attorneys,
5  including Amy B. Vandeveld. It is my understanding that Ms. Vandeveld then contacts
6  the business' or property owners' attorneys to demand that they comply with the
7  Settlement Agreements' required modifications.

8      12.    Most recently, about a week before the European Car Service Defendants
9  filed their Motion to Dismiss in this case, I re-visited Sundance Market to confirm
10  whether the modifications had been made that were required by our Settlement
11  Agreement. I found that the modifications were inappropriate and I took photographs for
12  my attorney, which I had printed on March 5, 2008, *two days before* the Defendants'
13  Motion to Dismiss was filed and served. Attached hereto as Exhibit "2" are true and
14  correct copies of the front and back of two photographs that I took at Sundance Market on
15  my recent visit, showing the print date-stamp on the back of the photographs.

16      13.    To the best of my recollection, some of the facilities that I re-visited to
17  compel ADA compliance, that still had barriers after our settlement, were: Murphy's
18  Market, Corner Liquor, San Altos Liquor, Big K Market, Western Towing and Food
19  Center. I was represented by Mark Potter with respect to the Food Center matter. I
20  advised Mr. Potter that the Food Center had not complied with our Settlement Agreement
21  and it is my understanding that he contacted the defendants' attorney in that case since
22  accessibility modifications were later made to that store.

23      14.    Further, despite my re-visits to ensure compliance, at least one business
24  continued to flout access laws and our Settlement Agreement. Murphy's Market
25  originally did not comply with our Agreement and did not install an accessible parking
26  space as was required. I understand that my attorney, Ms. Vandeveld, wrote a letter to
27  the defendant's attorney and an accessible parking space was installed, as required by the
28

4

1    Agreement. The space was located across the parking lot from the entrance, away from

2    the building, and adjacent to the sidewalk, because the business owner wanted to be able

3    to utilize a side door that would have been blocked if the accessible parking space were

4    located next to the building. Two years later, in 2007, I again re-visited the facility, and

5    the business appeared to have moved the accessible parking space next to the building,

6    but the new space had no required access aisle. I took photographs, which I provided to

7    my attorney and it is my understanding that she wrote another letter to the defense

8    attorney. The current accessible parking space is now next to the building, with an access

9    aisle. It is not in the same location as originally installed, but it is closer to the entrance

10    and is acceptable to me. The original accessible parking space has been abandoned, the

11    signs have been removed and the striping allowed to fade. But for my re-visits and my

12    attorney's letters, the current space would have had no access aisle.

13         15.     Given the fact that Murphy's originally complied with the Settlement

14    Agreement and then relocated the space a few years later without providing a required

15    access aisle, I have spent the last several months again re-visiting businesses to determine

16    if any have since failed to maintain the accessibility of their facilities. I have re-visited

17    virtually every facility, including the out-of-town motels, to check on the modifications.

18         16.     With respect to my lawsuits against car repair and car sales facilities, I am a

19    car fanatic. I love cars. In the past ten years I have owned several different cars. Most of

20    them are older vehicles that have required regular maintenance and frequent repairs.

21    Since becoming disabled, I have owned a 1987 Maxima, 1984 300ZX, 1977 Cadillac

22    Seville, two 1978 Cadillac Seville (although not at the same time) and 1979 Cadillac

23    Seville and a late 1970's Chevy Chevette. I currently own a 1997 Ford Expedition (with

24    248,000 miles on it) and a 1992 Mercedes station wagon. My experience, having been a

25    longtime car owner and having been an automotive parts and sales technician, is that

26    smaller repair shops do not charge as much as dealerships. This is why I try to visit

27    smaller shops when looking for estimates and repairs for my vehicles. I have always

28

1  been, and intend to continue to be, a comparison shopper.  I look for the best service at

2  the lowest cost.  In fact, I visited another repair shop that specifically specializes in

3  Mercedes Benz repairs around the time of my visit to European Car Service.  The other

4  facility had an accessible parking space, but it was blocked by repair vehicles, and I have

5  not yet filed a lawsuit against it.

6       17.     I initially visited the facilities listed in Defendants' Exhibit "7" for the

7  purpose of obtaining information about repair services and parts and to get estimates for

8  repairs.  For example, I wanted to visit MD Auto Repair to compare prices for tires and

9  rims for my SUV.  I wanted to visit JD Collision Center because my Mercedes' spoiler

10  was cracked and needed to be repaired and I wanted to determine if they perform that sort

11  of work.  I wanted to visit Precision Motors to get prices on tune-ups and oil changes for

12  regular maintenance on my SUV.  I have already monitored these facilities, after I filed

13  the lawsuit, and I intend to return to each of these facilities in June of 2008.  While I

14  cannot disclose the terms of my Settlement Agreement with those business owners and

15  property owners, I am hopeful that each of these facilities will be accessible to people

16  with disabilities in June of 2008.  All of the facilities are relatively close to my home in

17  Spring Valley and are located in a commercial area that is like an "auto shop alley",

18  where car owners can get multiple estimates from multiple repair and auto facilities.  I

19  intend to return to these facilities to ensure that they are accessible to people with

20  disabilities so that I have the option of utilizing their services and purchasing their goods

21  in the future.

22       18.     TNT Auto Sales is an auto sales lot, which I visited in April of 2007.  I am

23  always interested in looking at, pricing and potentially purchasing other vehicles, as is

24  evidenced by my car ownership history.  I often go to automobile sales lots to see what is

25  for sale, as well as to compare the prices of the inventory.  I intend to re-visit TNT Auto

26  Sales shortly after they complete the reconstruction of their facility and the pavement of

27  their lot, which I understand will occur in the near future.

28

19.    I visited the Auto Center to see if I could get an estimate for a tune-up on my Mercedes.  At that time, I was actually directed by an Auto Center employee to another shop that specializes in Mercedes Benz cars.  I intend to return to the Auto Center to compel compliance with the ADA.  Also, my SUV receives an oil change almost every three months.  I intend to re-visit the Auto Center, when it is accessible, to determine if their prices are competitive and, if so, to get an oil change.

20.    I went to Import Auto Body around the same time as my visits to JD Collision, Precision Motors, MD Auto Repair and the Auto Center.  As with JD Collision, I hoped to get an estimate for the repair of my Mercedes Benz spoiler.  I spoke with a man of Asian descent who told me that he was not able to give me an estimate at that time.  He gave me a card and requested that I call for an appointment.  I could not get out of my car because there was no accessible parking space.  I have not returned to the facility since my first visit because it is not accessible.  I intend to return to Import Auto Body after I am advised that modifications have been made so that I can determine if the facility has, in fact, complied with the ADA.  I also want to customize the fender flares on my Mercedes, so I would like to return to determine if they perform this sort of work and, if so, the cost.  If the cost is reasonable, I would like to have Import Auto Body perform the work.

21.    I want the same opportunities that non-disabled people have for car repairs. I want to be able to shop around, get various estimates, and have my car fixed at a reasonably priced, qualified facility.  I do not have that opportunity if the car repair facility or auto sales center does not even have an accessible parking space for my use.  I have returned to each of the facilities that I have sued that have not yet agreed to make accessibility modifications to monitor their status.  I also intend to return to each of the facilities to compel compliance with the ADA.

22.    With respect to the European Car Service business, I went to this repair shop because I wanted to have my 1992 Mercedes Benz tuned up.  The car was running

7

Case 3:07-cv-02394-LAB-WMC   Document 14-6   Filed 04/01/2008   Page 8 of 18

1  rough and I wanted to find a reasonably priced repair shop.

2      23.    I actually went to European Car Service and two other facilities looking for

3  a tune up for my Mercedes.  I went to European Car Service first to see if they could fix

4  my car and, if so, what the cost would be.  I was not able to get an estimate for repairs, so

5  the next day, I went to the Auto Center.  The Auto Center pointed me to another facility,

6  which I later visited.  I knew that a neighbor of mine worked at the other facility, but I

7  never knew where the other facility was located.  When I was directed to the other facility

8  by the Auto Center, I was able to talk with my neighbor about getting an estimate at that

9  other facility.  The accessible space at the other facility was blocked by vehicles being

10  repaired and I could not park my car there.  Also, they were busy and I was given a card

11  to call back to schedule an appointment.  Ultimately, my Mercedes was repaired by my

12  neighbor who performed the work at my apartment parking space.

13      24.    European Car Service had no accessible parking space, nor did the Auto

14  Center.  The other facility had an accessible space but it was blocked by repair vehicles.

15  If I can park in an accessible spot, no one can park too close to me, so I can then open my

16  car door all the way.  I need to fully open my door because of my drop foot and

17  prosthesis.  Even at my apartment, I park my vehicles next to each other, and far enough

18  away from each other, so that I can open the Mercedes' door all the way.  In fact, I back

19  my Mercedes into my parking space so that my driver's door is next to my other car.  This

20  is evident in the photos included in Defendants' Exhibit "5" to their Motion.  The vehicle

21  to the right of my Mercedes is an SUV that I also own.  I back the SUV into its space so

22  that the driver's door is adjacent to the ramp located to the right of that second space.

23  That ramp leads to a level walkway that leads to my apartment.

24      25.    At European Car Service, I called out to a man who said he was the owner

25  of the business and I told him my car was running rough.  I asked if he could look at my

26  car and give me an estimate, but he told me that he was too busy and he refused to tell me

27  when he would have some time to look at my car.  I have monitored the facility during the

28

8

1  course of this lawsuit and no modifications have been made as of March 5, 2008. At

2  European Car Service, I am not able to exit my vehicle or get into the office because of

3  the absence of an accessible parking space and a ramp.

4        26.    When I filed my lawsuit against European Car Service, and even today, I

5  intended to return to the repair shop. First, I want to compel European Car Service to

6  remove architectural barriers, as required by the ADA. I want to be able to park my car in

7  an accessible spot and walk or roll into the office, like other non-disabled people. Since

8  my Mercedes is about 16 years old, it requires regular maintenance. I want to be able to

9  take it to low-cost repair shops that specialize in Mercedes vehicles. Ultimately I may

10  learn that European's repair costs are quite reasonable or I may learn that they are outside

11  of my budget, but I will never have that opportunity if I cannot even get out of my car at

12  the repair shop.

13        27.    I am committed to making my world more accessible for me and for others

14  with disabilities. Not only do I file lawsuits when I find facilities are not accessible, but I

15  also follow up to ensure that barriers are removed. I have spent my own money on gas

16  and photographs re-visiting businesses after lawsuits were settled simply because

17  accessibility is important to me.

18        28.    Attached hereto as Exhibit "3" are photographs of the parking lot and

19  walkway at European Car Service. These photos accurately depict the conditions that I

20  observed on July 10, 2007 during my first visit and on March 5, 2008 when I drove past

21  the facility to monitor its status. There was no ramp at the walkway and there were no

22  accessible parking spaces in the lot during either of my visits to the property.

23        I declare under penalty of perjury under the laws of the State of California and the

24  United States of America that the foregoing is true and correct.

25        Executed this 3-31 day of March, 2008 at San Diego, California.

26

27        _Karel Spikes_
          KAREL SPIKES

28

9

**Exhibit 2**

1   Lawrence Mudgett SBN 252898
2   Athanasios Preovolos SBN 182334
    Preovolos & Associates, a Law Corporation
3   401 B Street, Suite 1520
    San Diego, CA 92101
4   Telephone: 619-696-0520
    Facsimile: 619-238-5344
5

6   Attorney for Defendants
7   Zenon Smoczynski and European Car Service

8

### DECLARATION OF ZENON SMOCZYNSKI

9   I am ZENON SMOCZYNSKI, I have independent personal knowledge of the facts attested

10  herein and declare them to be true and correct under penalty of perjury. If called upon to do

11  so I could and would testify to the same.

12      1)    I am the sole owner and operator of European Car Service, I am the only
13            mechanic, I have no employees, and have been in business since on or about
14            1992.

15      2)    European Car Service is located at 8855 La Mesa Blvd in La Mesa, California
16            (hereinafter "the property") and I co-own the property with Andrew
17            Maciejewski.

18      3)    I specialize in repairing European automobiles, I have no retail inventory, and
              my clients do not frequently visit the property.

19      4)    The property consists of an office, mechanics garage, surrounding area, and
20            a vacant lot.

21      5)    My clients either contact me, their vehicles are towed to me, or they are
22            referred to me. I do not obtain clients by any other means.

23      6)    I do not service my client's European cars unless I am contracted to do so
24            first.

25      7)    My clients contract for services and then pay me upon completion.

26      8)    Oftentimes, individuals first contact me seeking a written estimate for my
              services.

27      9)    I have neither contracted with nor been paid by Karel Spikes.

28

-1-
Declaration of Zenon Smoczynski

10) I have never provided Karel Spikes a written estimate.

11) I was the only mechanic present at the property on July 10, 2007 and an individual that I now know to be Karel Spikes drove onto the property in a white Mercedes.

12) Karel Spikes did not exit his vehicle.

13) He rolled down his window and asked me for a quote to service his car. I cannot recall what he requested to have repaired.

14) I do not give anyone verbal quotes and refused to quote him a price.

15) Spikes then left European Car Service.

16) I have not seen Karel Spikes or his white Mercedes ever since.

17) I was not aware of his handicap as he did not exit his vehicle.

18) The entire incident lasted approximately one minute.

19) On or about March 5, 2008 my attorney Lawrence Mudgett showed me a photograph of Karel Spikes and a Mercedes model 300TE station wagon with disabled license plate number Y0628.

20) This was the first time I had seen Karel Spikes or that Mercedes wagon since July 10, 2007.

21) I had no basis to conclude the individual in the photograph was Karel Spikes or that the Mercedes wagon belonged to him but for my attorney's representations.

22) Upon seeing the photograph I was able to recall the incident described in sections 11- 18 above.

23) I was surprised that the individual in the incident above is the same man who is suing me now since I never worked on his car, prepared a quote, or was even aware of his handicap.

24) I have not serviced any Mercedes model 300TE wagons since the year 2000 and to the best of my knowledge, I cannot recall ever servicing any Mercedes model 300TE wagon at any time.

25) On January 15, 2008 I was the only employee present at European Car Service.

26) I was personally served with two copies of Plaintiff's complaint, one on behalf of myself and one on behalf of European Car Service.

27) Andrew Maciejewski was not present at European Car Service on January 15, 2008 and could not have been personally served there.

28) Andrew left San Diego on or about June 2001 and I have not seen him since.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: March 7, 2008

Zenon Smoczynski

Zenon Smoczynski